Donald NICHOLS, et al.

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, et al.

No. 3–86–0486.

United States District Court, M.D. Tennessee, Nashville Division.

Jan. 19, 1989.

Nader Baydoun, Harris & Baydoun, and Kenneth Jones, O'Hare, Sherrard & Roe, Nashville, Tenn., for plaintiffs.

Anthony Iannacio, Baker Worthington Crossley Stansberry Woolf, Nashville, Tenn., A. Inge Selden, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, Ala., for Merrill Lynch.

Leo Bearman, Jr., Roy Keathley, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., for Merrill Lynch, Sandestin Beach Hotel, Frank Flautt, Jr., William Mann, Wilton Hill, Sandestin Innkeepers, Fred and William Alias, and Robert Kamm.

William R. Willis, Jr., Willis & Knight, Nashville, Tenn., for Merrill Lynch, Sandestin Beach Hotel, Frank Flautt, Jr., William Mann and Wilton Hill.

Byron R. Trauger, Paul C. Ney, Jr., Doramus, Gideon & Trauger, Nashville, Tenn., Robert I. Chaskes, Frank, Bernstein, Conaway & Goldman, Tysons Corner, Va., for Dominion Federal Sav. & Loan Ass'n.

Thomas H. Peebles, III, Nashville, Tenn., Michael Edwards, Patricia A. McGee, Balch & Bingham, Birmingham, Ala., for Laventhol & Horwath.

Robert A. Heeken, Jacksonville, Fla., Robert Kamm, Memphis, Tenn., for Peter Bos.

Perry Allen Craft, Steven A. Hart, Asst. Atty. Gen., Nashville, Tenn., for amicus curiae the State of Tenn.

Winston S. Evans, Evans, Jones & Reynolds, Nashville, Tenn., for defendants.

## MEMORANDUM

HIGGINS, District Judge.

This is an action alleging fraud and other unlawful acts incident to the sale of securities in violation of federal securities laws, state blue-sky laws, the Racketeer Influence and Corrupt Organization Act (RICO), the Tennessee Consumer Protection Act

(TCPA), and various theories of common law liability discussed in more detail below. Plaintiff Donald Nichols and 112 others filed their original complaint in this Court on May 30, 1986.[1] The complaint names fourteen persons as defendants in this action. Those defendants which have filed motions presently under review are identified in the complaint as follows:

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) is a broker-dealer and a Delaware corporation with its principal place of business in New York, New York. Pursuant to an agreement with the Sandestin Beach Hotel, Merrill Lynch acted as the exclusive selling agent for the sale of hotel interests to all investors. Merrill Lynch substantially participated in preparing the Private Placement Memorandum (PPM) and the sales presentations made to the plaintiffs to induce them to purchase hotel interests.

Defendant Sandestin Beach Hotel (Sandestin) is a Florida corporation with its principal business office in Destin, Florida. Sandestin was incorporated for the express purpose of developing the resort hotel that became the focus of the litigation. It was to be responsible for setting up the hotel on a condominium basis and for all aspects of the resort's development, construction, and financing.

Defendant Dominion Federal Savings & Loan Association (Dominion) is a savings and loan association with its principal place of business in Tysons Corner, Virginia. Before any plaintiffs had bought their hotel interests, Dominion, Sandestin and Merrill Lynch agreed that Dominion would lend to people seeking money to finance the purchase of their hotel interests.

Defendant Laventhol & Horwath (Laventhol) is a partnership of certified public accountants having its principal place of business in Tampa, Florida. Before either the sale of hotel interests to the plaintiffs or the preparation of the PPM, Sandestin or its affiliates retained Laventhol to prepare financial projections and a market study to determine whether it was feasible to build the hotel and finance it through the sale of hotel interests. Laventhol played a significant role in preparing the financial projections set forth in the PPM.

Defendant Morton Olshan is a resident of New York. Since at least February 1983, he has been Vice President, a director and shareholder of Sandestin. The plaintiffs allege that Mr. Olshan owns more shares of Sandestin stock than any other shareholder. He provided funds to Sandestin to initiate the development of the hotel, thereby making it possible for Sandestin and its affiliates to proceed with the project.

In addition to these defendants who have filed motions to dismiss, plaintiffs have filed a motion to dismiss the counterclaim of certain individual defendants. These defendants/counterplaintiffs are:

1. Frank L. Flautt, Jr., a resident of Memphis, Tennessee, and since at least February 1983, he has served as President, a director and shareholder of both Sandestin and Sandcastle.[2] Mr. Flautt is alleged to be the individual chiefly responsible for developing the hotel, including formulating the financing plan, offering and selling hotel interests, and managing the entire development project.

2. William Jeffries Mann, a resident of Memphis, Tennessee. Since at least February 1983, he has been Vice President, a director and a shareholder of Sandestin.

3. Wilton D. Hill, a resident of Memphis, Tennessee. Since at least February

---

1. A companion case, *McInnis v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1355, was filed in the Northern District of Alabama and later transferred to this Court. Although *McInnis* arose from the same factual situation, it has not been consolidated with the present case except for limited purposes during discovery. Unlike the present case, *McInnis* is a class action.

2. Defendant Sandcastle, a Florida corporation, is an affiliate of Sandestin and was responsible, along with Sandestin, for devising the plan by which the hotel was developed, financed, and managed. Sandcastle, pursuant to the COA Management Agreement, is responsible for managing the hotel's common area operations. This management arrangement was established prior to construction of the hotel and prior to the plaintiffs' purchase of their hotel interests.

**1314**

1983, he has been the Secretary/Treasurer, a director and a shareholder of Sandestin.

4. Fred V. Alias, a resident of Destin, Florida. Since at least February 1983, he has been a shareholder, an officer and a director of Sandcastle and Sandestin Beach Resort, Inc., both of which corporations are affiliated with Sandestin.

5. William Alias, Jr., a resident of Destin, Florida. Since at least February 1983, he has been a shareholder, an officer and a director of Sandcastle and Sandestin Beach Resort, Inc.

6. Robert Kamm, a resident of Memphis, Tennessee. Mr. Kamm is Vice President of Sandcastle and is also the Vice President of Financial for Flautt Properties, formerly Flautt and Mann Properties, a corporation controlled by defendant Frank Flautt and operated for the purpose of developing and managing real property.

Disparate as these defendants are, they all had one thing in common. All were involved in some way in the development and promotion of a Gulf Coast resort in Destin, Florida. The resort was called the Sandestin Beach Hilton Hotel (the Hotel). The Hotel was to be a sizable affair, with fifteen stories and four hundred rooms. Like many such projects in recent years, it was planned to be a condominium complex. Each buyer acquired fee simple title to his own room and received an undivided interest in the resort's common areas. The plaintiffs allege that they bought such interests in the Hotel in December 1984.

The plaintiffs allege that they were induced to buy rooms by the defendants' attractive Private Placement Memorandum, which described the resort and its potential in somewhat rosy terms. The PPM had three parts: (1) the "legal document," a formal disclosure document that purports to contain the disclosures required by the securities laws; (2) a collection of exhibits to the legal document; and (3) a brochure containing photographs, drawings, and narrative descriptions of various aspects of the Hotel.

The alleged deficiencies generally concern (1) statements about the position, orientation, and location of the Hotel on the beach and the view from each hotel room; (2) statements concerning the profits realized by the developers from the sale of hotel interests; (3) financial projections concerning the expected profitability of the Hotel; (4) the adequacy of the Hotel's structural facilities; and (5) miscellaneous internal inconsistencies and inadequacies in the sales presentation materials. In addition to these specific inadequacies of the PPM, plaintiffs also allege oral misrepresentations made to them concerning the same subject matter.

The Honorable Thomas Wiseman, Jr., United States District Judge for the Middle District of Tennessee, recused himself in this action on August 6, 1986. The action was then transferred to this Court and on March 12, 1987, this Court referred the following motions to the Honorable Kent Sandidge III, United States Magistrate: (1) motion (filed March 6, 1987) of defendant Morton Olshan to dismiss; (2) motion (filed March 6, 1987) of defendant Dominion to dismiss or alternatively for summary judgment; (3) motion (filed March 6, 1987) of defendant Michael D. Williams to dismiss; (4) motion (filed March 6, 1987) of defendant Laventhol to dismiss; (5) motion (filed March 6, 1987) of defendant Merrill Lynch to dismiss or alternatively for summary judgment; and (6) motion (filed March 6, 1987) of defendants Sandestin Beach Hotel, Inc., Sandcastle, Frank Flautt, Jr., William Jeffries Mann, Milton D. Hill, Fred V. Alias, William Alias and Robert Kamm for summary judgment.[3]

A hearing on the motions was held before the Magistrate on March 3, 1988. On

**3.** Argument on the motion of the Sandestin Beach Hotel defendants for summary judgment was reserved pursuant to the Court's order of May 14, 1987, regarding scheduling and case management. That order provides at paragraph ten that "the Court shall reserve ruling on any pending motions for summary judgment until the parties have had a reasonable opportunity to complete discovery pertaining to such motions." Because the stay of discovery has not yet been lifted, the Magistrate was of the opinion that the defendants' motion was not yet ripe for consideration.

July 1, 1988, the Magistrate filed his Report and Recommendation, in which he concluded that

(1) all of the plaintiffs' complaints against all defendants should be dismissed under Rule 12(b)(6), Fed.R.Civ.P., insofar as they were based on (a) Section 17(a) of the Securities Act of 1933, (b) the Tennessee Consumer Protection Act, and/or (c) RICO;

(2) the complaint against Merrill Lynch for vicarious liability based on the conduct of Michael Williams should be dismissed;

(3) the claims against defendant Morton Olshan for breach of contract and breach of warranty should be dismissed;

(4) the defendants' counterclaim against the plaintiffs should be dismissed; and

(5) in all other respects, the motions to dismiss should be reserved pending ninety days of discovery and the filing of an amended complaint.

So the matter stands now. This Court has jurisdiction over the controversy by virtue of 28 U.S.C. § 1331, 15 U.S.C. §§ 77v and 78aa, and 18 U.S.C. § 1964.

The Court will consider the objections to the Magistrate's Report seriatim.

## I. PRIVATE CAUSE OF ACTION UNDER § 17(a)

The complaint alleges a violation of § 17(a) of the Securities Act of 1933. 15 U.S.C. § 77q(a). That section provides:

> It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> 1) to employ any device, scheme, or artifice or defraud, or
>
> 2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> 3) to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.

In his Report, the Magistrate recommended that all claims predicated on § 17(a) be dismissed on the ground that this section did not create a private cause of action for aggrieved purchasers of securities.

This question is one that has been agitated for some time in the courts. The face of the statute is silent as to the existence of a private cause of action, and the circuit courts of appeal are divided on the question. The Second, Fourth, Seventh and Ninth Circuits have found that a private cause of action under § 17(a) does exist. *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 815 (9th Cir.1981); *Kirshner v. U.S.*, 603 F.2d 234, 241 (2d Cir.1978); *Daniel v. International Brotherhood of Teamsters*, 561 F.2d 1223, 1244–46 (7th Cir.1977); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir.1975). On the other hand, the Fifth and Eighth Circuits have rejected arguments for a private cause. *Landry v. All-American Assurance Co.*, 688 F.2d 381, 391 (5th Cir.1983); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152, 159 (8th Cir.1977). The Sixth Circuit has, in the past, issued opinions that seemed to presume the existence of a private cause. *E.g., Gutter v. Merrill Lynch, Pierce, Fenner & Smith*, 644 F.2d 1194, 1196 (6th Cir.1981); *Nickels v. Koehler Mgmt. Corp.*, 541 F.2d 611, 614 (6th Cir. 1976). However, in a more recent case, the Sixth Circuit refused to decide the issue squarely in view of the inter-circuit conflict. *Herm v. Stafford*, 663 F.2d 669, 678 (6th Cir.1981). A decision in this district held against a private cause. *Akers v. Bonifasi*, 629 F.Supp. 1212, 1222 (M.D. Tenn.1984).

The Supreme Court is aware of the running battle between the circuits on the question, but has apparently decided to sit back and enjoy it for awhile. On several occasions, it has refused to decide the issue. *E.g., Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 304, 105 S.Ct. 2622, 2625, 86 L.Ed.2d 215 (1985); *Herman & Maclean v. Huddleston*, 459

U.S. 375, 378, 103 S.Ct. 683, 685, 74 L.Ed.2d 548 (1983); *Int'l Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drugstores,* 421 U.S. 723, 733, 95 S.Ct.1917, 1924, 44 L.Ed.2d 539 (1975).

■ Plaintiffs urge this Court to recognize a private cause under § 17(a) because a majority of the circuits that have considered the issue have held that such a private cause exists. That factor alone, however, cannot be decisive. Authorities must be weighed as well as counted, and the majority of the circuits recognizing a private cause under § 17(a) have done so after little or no analysis.[4]

■ The issue is also affected by one other consideration: it is not as easy for plaintiffs to claim an implied private cause of action as it used to be. That is the practical result of the Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which laid down a four-part test for determining whether a statute has created an implied private action. The affected court must ask:

> First is the plaintiff "one of the class for whose special benefit the statute was enacted," ...—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative

scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. at 2087 (cites omitted).

It is significant that of the four circuits recognizing the private cause, none did so after considering the *Cort* test. The principal decision analyzing the *Cort* factors was the Fifth Circuit case of *Landry v. All-American Assurance Co., supra.* The Fifth Circuit believed that post-*Cort* decisions of the Supreme Court[5] had imposed even more strict limits on the implication of private causes. In applying the modified *Cort* analysis, the *Landry* court found that the face of the statute does not indicate Congressional intent to establish a private cause. Further, the legislative history of the 1933 Act indicates that Congressional discussion of civil liability centered on §§ 11 and 12. Thus, in the *Landry* court's view, the proposed private cause failed the first two points of the *Cort* test. As to the third (consistent with the Act's underlying purpose), the court noted that the other sections of the 1933 Act require that "strict procedural requirements" be met before a private cause of action could be supported. To allow a private cause of action under § 17(a) without these procedural hurdles would "effectively frustrate the carefully

---

**4.** For example, in deciding the *Kirshner* case, the Second Circuit devoted all of two paragraphs to the question. *Kirshner, supra,* 603 F.2d at 241. The majority referred to Judge Friendly's widely-noted concurring opinion in *S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968), in which he said that "once it had been established ... that an aggrieved buyer has a private action under § 10(b) of the 1934 Act [which no one denies] there seemed little practical point in denying the existence of such an action under § 17...." *Texas Gulf Sulphur,* 401 F.2d at 867. (Friendly, J., concurring).

It seems to this Court that too little attention has been paid to the presence of the word "practical" in Judge Friendly's sentence. His remark may better be understood as a mild criticism of the statutory scheme than as a judgment that the private cause was intended. That seems to

have been the position of Judge Friendly himself in later cases. In one instance, he criticized the *Kirshner* decision, saying that in view of the Supreme Court's reservation of the issue it "may be open to reexamination." *Yoder v. Orthomoleculer Nutritional Institute, Inc.,* 751 F.2d 555, 559 (2d Cir.1985).

**5.** In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the court, in rejecting a private cause of action under § 17(a) of the 1934 Act, held that the four *Cort* factors are not of equal weight. Factors indicating the intent of Congress are more important than the question of whether or not the cause was traditionally relegated to state law. *See also Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

laid framework of the Act." The *Landry* court was of the opinion that the cause of action was not a part of the states' traditional domain, but since that satisfied only one of the four tests of *Cort* (and that one the least important), the court concluded that no private cause existed under § 17(a).

Given its implications for their position, it is not surprising that the present plaintiffs have plenty to say about *Landry*, not much of it good. Some of their criticisms are well founded. It does seem, for example, that the *Landry* court misunderstood the first prong of the *Cort* test. The key question of that prong is whether the plaintiffs are part of a class for whose "special benefit" the statute was enacted. The plaintiffs are purchasers of securities. If they are not members of the class the authors of the Securities Act of 1933 intended to protect, it is hard to imagine who would be. But instead of drawing the obvious conclusion, the Fifth Circuit went off on a tangent, examining the face of the statute in an apparent search for language which would not make sense if Congress had not intended a private cause. Such an inquiry is not relevant, let alone essential, to a determination of the threshold question. Indeed, the first prong of the *Cort* test will ordinarily be the easiest hurdle for a buyer of securities.

With regard to the second prong, the *Landry* court was on much firmer ground. The provision of express causes in other sections of the Act makes the omission of such provisions in § 17(a) all the more glaring. The normal inference would be that Congress intended the other sections for private cause, leaving it to the SEC to enforce § 17(a). The weakness of the plaintiffs' position on this question may be seen from the fact that they are reduced to an argument from Congressional inertia. Congress, we are told, "ratified" the private cause by refusing to amend the Act to reject any private cause under § 17(a) after some courts implied one. Relying on legislative inactivity to prove legislative intent is, at best, a risky business. Very often it literally amounts to making something out of nothing. This case does not appear to be one of the few exceptions. Since Congress did nothing while the lower federal courts divided on the issue, it seems more reasonable to believe that it was waiting to see how the Supreme Court would dispose of the question—just like the rest of us.

The third *Cort* factor is the potential relation of the private cause to the statute's underlying purpose. In some ways this is the trickiest prong for courts to consider, since it will almost always be possible for plaintiffs to argue that a private cause would further the purpose of the statute, at least in the sense of being consistent with it. Time-honored language about the "remedial purpose" of the statute militating against its strict construction often makes its appearance here. (Not surprisingly, the present plaintiffs urge both of these arguments upon this Court.)

The Supreme Court's post-*Cort* decisions, however, seem to require something more. Their sense is that it is not enough that a private cause be consistent with the underlying purpose of the statute in some general way. The cases seem to point to the conclusion that a private cause should be implied only if the statutory purpose would be frustrated without it. In the present context, this would involve an implicit finding that a regulatory scheme providing for SEC enforcement of § 17(a) combined with private remedies under other sections of the Act is patently inadequate. This Court cannot, with confidence, make such a finding. Rather, the Court is persuaded by these comments on the structure of the Act by a distinguished commentator:

> It is one thing to imply a private right of action under § 10(b) or the other provisions of the 1934 act, because the specific liabilities created by §§ 9(e), 16(b) and 18 do not cover all the variegated activities with which that act is concerned. But it is quite another thing to add an implied remedy under § 17(a) of the 1933 act to the detailed remedies specifically created by §§ 11 and 12. The 1933 act is a much narrower statute. It deals only with disclosure and fraud *in the sale* of securities. It has but two important substantive provisions, §§ 5 and 17(a). Noncompliance with § 5 results in civil liability

under § 12(1). Faulty compliance results in liability under § 11. And § 17(a) has its counterpart in § 12(2). It all makes a rather neat pattern. Within the area of §§ 5 and 17(a), §§ 11 and 12 (unlike §§ 9(e), 16(b) and 18 of the 1934 act) are all-embracing. This is not to say that the remedies afforded by §§ 11 and 12 are complete. But the very restrictions contained in those sections and the differences between them—for example, the fact that § 11 but not § 12 imposes liability on certain persons connected with the issuer without regard to their participation in the offering and the fact that § 12(2) does not go so far in relation to § 17(a) as § 12(1) goes in relation to § 5—make it seem the less justifiable to permit plaintiffs to circumvent the limitations of § 12 by resort to § 17(a). Particularly is this so in view of the fact that § 11, together with the statute of limitations in § 13, was actually tightened in the 1934 amendments to the Securities Act.

3 L. Loss, *Securities Regulation* 1785 (2d. ed. 1961).

This Court agrees with the Fifth Circuit that the cause is not one "traditionally relegated to state law," but in view of the analysis under the other *Cort* factors, that conclusion is of little practical consequence.

Suffice it to say that this Court agrees with and adopts the Magistrate's conclusion that there is no private cause of action under § 17(a) of the Securities Act of 1933.

## II. APPROPRIATE STATUTE OF LIMITATIONS FOR PLAINTIFFS' § 10(b) CLAIMS

Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe....

S.E.C. Rule 10b–5, promulgated by authority of this statute reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud.

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

It has long been settled that an action under SEC Rule 10b–5 is available to private plaintiffs. *E.g., Herman & Maclean v. Huddleston*, 459 U.S. 375, 387, 103 S.Ct. 683, 690, 74 L.Ed.2d 548 (1983); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 513 (E.D.Pa.1946).

But since this cause of action is implied rather than expressly granted by the terms of the Act, no statute of limitations is specified for it in the Act or the Rule. In such circumstances, it is the practice of the federal courts to "borrow" the statute of limitations of the statute of the forum state most analogous to the federal law under which the action proceeds. *E.g., Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 210, 96 S.Ct. at 1389; *Carothers v. Rice*, 633 F.2d 7, 12 (6th Cir.1980). Over the years, the question of which state statute is "more analogous" has spawned much litigation. Usually it has come down to a choice between the forum state's blue-sky law and the statute of limitations for common-law actions based on fraud or deceit.

Plaintiffs tend to prefer the latter, since it is usually longer.

Such is the situation in the present case. Tennessee's statute of limitations for common-law fraud actions is three years. Tennessee's blue-sky statute, on the other hand, provides that no action may be brought under it more than one year after the discovery of the alleged fraud, and in no event more than two years after the commission of the alleged fraud. Tenn. Code Ann. § 48–2–122(h).

▉ The parties have different theories about the nature and sequence of their dealings. The initial complaint was filed on May 30, 1986. According to the defendants, the "purchase" of the security occurs when a "binding commitment to undertake the transaction" is formed, regardless of the date of actual transfer. Defendants allege that the plaintiffs had all made such commitments, at the latest, by closing—September 6, 1983. The plaintiffs, however, insist that the securities were not "sold" for purposes of the statute until the deals were consummated in December, 1984.

Obviously, if the defendants' theory of the meaning of the word "sale" is correct, then the plaintiffs' action would be time-barred under either of the two statutes of limitations in the Tennessee blue-sky laws. On the other hand, if the "sale" occurred at the moment of actual transfer in December, 1984, such claims as allege the "discovery" of fraud after May 30, 1985, would survive, regardless of which statute of limitations was applied. Finally, if the proper limitations period for borrowing is the three-year statute of limitations for fraud, all of the plaintiffs' claims survive even if the defendants' version of the facts is accepted.

The Magistrate concluded that the date of the statute of limitations began to run on the plaintiffs' claims is an issue of fact and cannot be properly adjudicated on a motion to dismiss. However, since one of the competing theories as to the applicable

statute has the potential for obviating any consideration of such matters, it would be well to consider that issue first. The best place to start is with a look at the Tennessee blue-sky law.

The Tennessee Securities Act of 1980, Tenn.Code Ann. § 48–2–101 et seq., closely resembles the blue-sky laws of a number of other states.[6] The anti-fraud section of the Act is Tenn.Code Ann. § 48–2–122, subsection (h), which states:

"No action shall be maintained under this section unless commenced before the expiration of two (2) years after the act or transaction constituting the violation or the expiration of one (1) year after the discovery of the violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires."

The Magistrate remarks that the question of when the statute began to run is a question of fact and thus not susceptible to being resolved on a motion to dismiss. That is true, so far as it goes. It seems to this Court, however, that the dispositive issue here is really a mixed question of fact and law. If the defendants' theory of the meaning of "sale" is correct, and this Court determines that the statute of limitations must be borrowed from the Tennessee blue-sky laws, then the plaintiffs' claims must be dismissed as a matter of law, since no set of facts available to them would keep their actions from being time-barred. Therefore, the matter cannot be side-stepped.

*Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir.1972), cited by the defendants, is not really on point because it is an insider trading case. In that situation, the important time to be considered is the time that illicit use was made of the forbidden information, and that will often have little to do with the actual date the security changed hands. However, there is a good deal of other authority supporting a broad interpretation of the

---

6. The annotation in the short title of the Act, Tenn.Code Ann. § 48–2–101, lists the following states as having "comparable" legislation: Alabama, Arkansas, Georgia, Kentucky, Mississippi, Missouri, North Carolina and Virginia.

word "sale" to include various kinds of agreements to sell. A contract for the transfer of stock is a "sale" for SEC Rule 10b–5 purposes, even if the actual transfer never takes place, or even if it is subject to specified conditions. *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 559 (2d Cir.1985); *International Controls Corp. v. Vesco*, 593 F.2d 166, 181 (2d. Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979). A pledge of stock "is equivalent to a sale for purposes of the antifraud provisions of the federal securities laws." *Marine Bank v. Weaver*, 455 U.S. 551, 554, 102 S.Ct. 1220, 1222, 71 L.Ed. 2d 409 (1982). In short, there is at least a possibility that in the present case a "sale" of securities occurred before December 1984. But the key word here is "possibility."

In spite of all this, the Magistrate's practical conclusion was correct. This Court cannot determine from the pleadings whether such "agreements" as existed before closing were contracts to sell, and thus "sales" within the meaning of Rule 10b–5. That is an issue for trial. This Court therefore adopts the Magistrate's conclusion and will deny the motions to dismiss on this issue.

But since the matter cannot be finally resolved until the proper statute of limitations is selected, and that issue has been placed before the Court, it is expedient to decide it without further delay.

■ The Sixth Circuit has not yet spoken to the issue of which Tennessee statute of limitations should be borrowed for SEC Rule 10b–5 purposes, but the federal district courts of the State of Tennessee are split. In *Media General, Inc. v. Tanner*, 625 F.Supp. 237 (W.D.Tenn.1985), it was held that the most analogous limitation was that governing actions for fraud. The *Media General* court was influenced by the similarity of the elements of proof between a Tennessee common-law fraud claim and a SEC Rule 10b–5 claim, and also by the policy consideration that where two or more state law remedies more or less resemble SEC Rule 10b–5, courts should borrow the longer limitations period in order

to effect the remedial purpose of the federal securities laws. 625 F.Supp. at 246–47.

Decisions to the contrary have been rendered in the other two federal districts of this state. A recent decision in this district criticized *Media General*, noting that the wording of SEC Rule 10b–5 and the corresponding section of the Tennessee blue-sky law, Tenn.Code Ann. § 48–2–121(a) is virtually the same, a circumstance which in Judge Nixon's view outweighed the similarities in the proof between SEC Rule 10b–5 and a fraud action. He therefore held that the appropriate limitations period was that of Tenn.Code Ann. § 48–2–122(h), which allows actions within two years of the "transaction constituting the violation" or one year after the discovery of the violation, whichever comes first. *Ockerman v. May Zima Co.*, 694 F.Supp. 414, 416 (M.D.Tenn. 1988). In an unreported decision in the remaining district of Tennessee, the court reached the same conclusion. *Haney v. Dean Witter Reynolds, Inc.*, No. CIV–1–85–531 (E.D.Tenn. August 20, 1986) [available on Westlaw, 1986 WL 21340].

A survey of federal court decisions in states with blue-sky statutes comparable to Tennessee's reveals that the great weight of authority favors the position taken by the *Ockerman* court. Among the pertinent circuit courts, only the Fifth Circuit has taken *Media General's* position. *McNeal v. Paine, Webber, Jackson, Curtis, Inc.*, 598 F.2d 888 (5th Cir.1979) (Georgia law). Two district courts in Georgia have done the same—*Friedlander v. Troutman, Sanders, Lockerman, & Ashmore*, 595 F.Supp. 1442 (N.D.Ga.1984); *In re North American Acceptance Corp.*, 513 F.Supp. 608 (N.D.Ga.1981)—but their decisions became dead letters when the Eleventh Circuit reversed *Friedlander*. 788 F.2d 1500 (11 Cir.1986). A handful of other district courts have applied the statute of limitations for common-law fraud. *Upton v. Trinidad Petroleum Corp.*, 468 F.Supp. 330 (N.D.Ala.1979); *First Federal Savings & Loan Ass'n. of Miami v. Mortgage Corp. of the South*, 467 F.Supp. 943 (N.D. Ala.1979); *Felts v. Nat'l. Account Systems*

*Ass'n., Inc.,* 469 F.Supp. 54 (N.D.Miss. 1978).

The Fifth Circuit has since modified its position, essentially limiting *McNeal, supra,* to its facts and ruling that, under Alabama's statutory scheme, the limitations period should be taken from the blue-sky statute. *White v. Sanders,* 650 F.2d 627 (5th Cir.1981) (Alabama law).[7] The result in other circuits has been the same. *Gurley v. Documation, Inc.,* 674 F.2d 253 (4th Cir.1982) (Virginia law); *Morris v. Stifel, Nicolaus & Co., Inc.,* 600 F.2d 139 (8th Cir.1979).

Fifteen decisions of the district courts in the pertinent states have adhered to the doctrines of *Ockerman* and *Haney.* To list them all would take more space than is necessary to make the point.

Nevertheless, the Court is not at liberty to decide the issue on a mere head-count of participating judges. Tennessee is a Sixth Circuit state, and it appears that that circuit has developed a distinctive approach to the question, one closer to *Media General* than to *Ockerman.* While the Magistrate is surely right in pronouncing uniformity within a given district an important consideration, it is at least as important that district courts adhere to the doctrines most consistent with the rules and policies of the circuit above them.

Of the states listed as having "comparable" statutes, only Kentucky is in the Sixth Circuit. The Kentucky statutes have given rise to two important cases about the borrowing of statutes of limitations.

*Carothers v. Rice,* 633 F.2d 7 (6th Cir. 1980) involved alleged fraudulent misrepresentations during a tender offer. The court held that the limitations period of the Kentucky blue-sky statute rather than that for common-law fraud was applicable to a SEC Rule 10b–5 action on the claim. But it did so for an interesting reason:

> [T]he broad remedial purposes of the federal securities laws are best served by longer, not shorter, statute [sic] of limita-

tions ... But the reason for using the longer statute of limitations for a federal securities claim is *to give the person with a federal claim at least as long an opportunity to sue as a person with a state claim ...* The Kentucky Supreme Court has held that its blue-sky law is the *exclusive remedy* for fraud in the sale of securities. [*City of Owensboro v. First U.S. Corp.,* 534 S.W.2d 789, 791 (Ky.1975) ] The strict requirements of misrepresentation have been relaxed and the price exacted is a shortened statute of limitations ... A plaintiff is also relieved from proving all the elements of misrepresentation with his rule 10b–5 action; thus, it is reasonable to apply the shortened statute of limitations. (cites omitted; emphasis added)

*Carothers,* 633 F.2d at 14–15. The clear implication of this language is that had it not been for the construction given the blue-sky law by the Kentucky court, the statute of limitations governing common-law fraud would have been applied. The *Carothers* doctrine was again followed by the Sixth Circuit in *Herm v. Stafford,* 663 F.2d 669, 678 (6th Cir.1981).

There is no Tennessee case holding that the Tennessee Securities Act of 1980 is the exclusive remedy for defrauded buyers of securities in the state. Therefore, under existing law the only way to guarantee that a federal plaintiff enjoys the same procedural advantage as a state plaintiff with the same cause is to apply the longer statute of limitations.

Accordingly, the Court finds that in an SEC Rule 10b–5 action, federal courts in this state should borrow the three-year statute of limitations governing actions for common-law fraud.

It follows that the plaintiffs' SEC Rule 10b–5 claims are not time-barred and therefore the defendants' motions to dismiss must be denied.

---

**7.** Note that because of *White* the continued vitality of the two Northern District of Alabama cases cited *supra* is in question. Alabama, of course, is no longer in the Fifth Circuit. Even so, a recent decision in that district applied the limitations period of the blue-sky law. *Hunt v. American Bk. & Trust Co. of Baton Rouge,* 606 F.Supp. 1348 (N.D.Ala.1985).

**1322**

### III. PLAINTIFFS' CLAIMS UNDER SECTION 12(2) OF THE 1933 ACT

■ Defendants argue that the plaintiffs' § 12(2) claims are time-barred by the operation of the 1933 Act's statute of limitations, which forbids any action unless brought within one year of the facts supporting the cause or within three years of the cause occurring.

The Magistrate correctly determined that the date of occurrence in the present case, and consequently the date the statute began to run, is a question of fact which cannot be determined from the pleadings. Therefore, the motion to dismiss will be denied.

### IV. APPLICABILITY OF THE TENNESSEE CONSUMER PROTECTION ACT

■ The plaintiffs allege that by engaging in unfair and deceptive acts or practices in the marketing and sale of securities, the defendants violated the Tennessee Consumer Protection Act (TCPA), Tenn.Code Ann. § 47–18–101 *et seq*. The defendants' position is that the Act does not apply to the sale of securities.

Whether the TCPA applies to such transactions is a question of first impression in the state. In the absence of any Tennessee precedents, it falls to the Court to make an "*Erie* -guess" as to the possible decision of the Tennessee Supreme Court were the matter to come before it.

In the present case, the Magistrate has made a thorough study of the factors affecting this decision, including the intent of the Tennessee legislature in passing the law, the impact of the federal scheme of securities regulation, and cases construing comparable statutes in Tennessee's sister states. After painstaking consideration, the Magistrate concluded that the Tennessee Supreme Court, if it were confronted with the issue, would hold that the TCPA does not apply to the marketing and sale of securities. The Court agrees.

The TCPA was enacted in 1977 to protect "consumers and legitimate business enterprises from unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within the state...." Tenn.Code Ann. § 47–18–102(2). The statute, by its terms, is silent about securities; nothing about them appears in the catalogue of offenses in § 47–18–104(b). That, however, does not end the inquiry, for the enumeration of specific unlawful acts was plainly not understood to be exhaustive. That can be seen by referring to § 47–18–104(b)(21), which extends the coverage of the Act to those "[e]ngaging in any other act or practice which is deceptive to the consumer...." Thus, it becomes a question of whether this "Mother Hubbard" clause suffices to bring securities transactions within the ambit of the Act.

The Magistrate found the answer in another section of the Act, § 47–18–115, which states:

> 47–18–115. *Construction.*—This part, being deemed remedial legislation necessary for the protection of the consumers of the state of Tennessee and elsewhere, shall be construed to effectuate the purposes and intent thereof. It is the intent of the general assembly that this part shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)). [Acts 1977, ch. 438, § 16.]

The Magistrate noted that no federal court has ever held that the pertinent section of the Federal Trade Commission Act (FTCA) applies to securities transactions, and that there is substantial authority to the contrary.

The Magistrate further noted that the overwhelming weight of state court authority favors the view that state consumer protection laws do not apply to securities transactions, and found additional support for his conclusion in the fact that securities are already intensely regulated under the federal securities laws and the Tennessee blue-sky laws.

The discussion of the issues and authorities in the Magistrate's Report is superb. It would improve nothing for the Court to

replicate or paraphrase his treatment in the present memorandum. The Court prefers to adopt this portion of his Report *in toto*, and will add separate comments only to the extent necessary to address specific objections to the Report raised by the Attorney General and adopted by the plaintiffs.

The Attorney General argues that the Magistrate gave insufficient attention to the recent Tennessee case of *Skinner v. Steele*, 730 S.W.2d 335 (Tenn.App.1987) *perm. to appl. denied*, which is alleged to have rejected reasoning of the type that the Magistrate relied upon.

*Skinner* was a suit under the TCPA alleging fraud in the sale of an annuity certificate by an insurance company. Among the defenses to the action was the assertion that such transactions were governed by the Tennessee Insurance Law, Tenn.Code Ann. §§ 56–2–203, *et seq.*, and that they were therefore specifically excluded from the purview of the TCPA by virtue of § 47–18–111(a) which exempts from that Act any

> [a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies ... acting under the authority of this state or of the United States.

The court rejected these arguments, holding firmly that the TCPA applies to insurance transactions in spite of the existence of a separate regulatory scheme for the insurance industry. The statutory exemption for "transactions specifically authorized" by the insurance code was explained thus:

> The purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid conflict between laws, not to exclude from the Act's coverage every activity that is authorized or regulated by another statute or agency.

*Skinner*, 730 S.W.2d at 337.

The court further found that the Insurance Code, by its own terms, does not purport to provide an exclusive remedy. The State of Tennessee, by the amicus brief of the Attorney General, contends that by the same token, the existence of parallel regulatory schemes (whether state or federal) does not preclude the application of the TCPA to transactions in securities. This Court is unpersuaded.

The state's argument proceeds from the tacit premise that the insurance industry and the securities trade are alike enough to justify using very similar regulatory approaches. Where state precedent is sparse, analogy can be necessary, but the user must beware. A maladroit analogy can send the law spinning off in the wrong direction. The present case underscores this point.

The Magistrate below was aware of several insurance-related cases in apparent conflict with the result he reached, but he did not discuss the analogy to insurance law at any great length. He remarked in a footnote that "securities transactions are wholly different animal[s] from insurance transaction[s]." The Court believes he was right, but because the state is urging the issue strongly on appeal, it is expedient to take a closer look at these "animals" to determine the proper place of each in the legal bestiary. As always, it is useful to consider the experience of other states. The experience of one particular state is especially helpful in that the insurance-securities-consumer protection problem has been thrashed out more thoroughly there than anywhere else. The state in question is Massachusetts.

The Massachusetts' statute for the Regulation of Business Practices for Consumers' Protection, Mass.Gen.Laws Ann. ch. 93A (1972) differs from the TCPA in certain respects, but is similar with regard to the features affecting this litigation. Like the TCPA, its definitions establish a very broad coverage of affected practices. "Trade" or "commerce" is defined to include "offering for sale ... any property, tangible or intangible ... and any other article, commodity, or thing of value...." Mass.Gen.Laws

Ann. ch. 93A § 1(b). Compare this to the TCPA's definition of "consumer," to which the *Skinner* court attached great significance: "any natural person who ... acquires by purchase ... any ... property, tangible or intangible ... [or] any other article, commodity, or thing of value...." Tenn.Code Ann. § 47–18–103(1). Cf. *Skinner v. Steele, supra,* 730 S.W.2d at 336–37. The Massachusetts Act, like the TCPA, is to be applied according to pertinent federal constructions of the FTCA and concomitant FTC regulations. Mass.Gen.Laws Ann. ch. 93A § 2. Moreover, the Massachusetts Act has a provision (substantially the same as that of the TCPA) exempting "transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth of the United States." *Id.,* 63.

In 1977, the Supreme Judicial Court of Massachusetts confronted the issue of whether the state's Deceptive Trade Practices Act applied to the insurance industry. On that occasion it held decisively that the statute did apply, despite the existence of a separate statutory scheme for the regulation of insurance. The court was of the opinion that "[t]he mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter." *Dodd v. Commercial Union Ins. Co.,* 373 Mass. 72, 365 N.E.2d 802, 804–05 (1977). It was later held that wrongs committed by insurance companies can result in "loss of property" as contemplated by the statute. *DiMarzo v. American Mutual Ins. Co.,* 389 Mass. 85, 449 N.E.2d 1189, 1196 (1983).

A relatively early and unnoticed federal decision held that the Massachusetts Act did not apply to transactions in securities because the FTCA did not. *Palace v. Merrill Lynch, Pierce, Fenner & Smith,* No. 80–1831–T, Fed.Sec.L.Rep. (CCH) ¶ 99,629 (D.Mass.1981) [1981 WL 1411]. But in 1983 a federal court in Massachusetts was confronted with the argument that *Palace* had been wrongly decided, since the reasoning underlying it was inconsistent with

*Dodd,* and certain other Massachusetts state court decisions applying Chapter 93A (the consumer protection statute) to transactions not regulated under the FTCA. Cf. *Dodd, supra,* and *Raymer v. Bay State Nat'l. Bank,* 384 Mass. 310, 424 N.E.2d 515, 521 (1981) (Ch. 93A applies to banking business).

The court, however, was unconvinced and left *Palace* intact. It explained:

*Dodd* and *Raymer* applied Chapter 93A to insurance and banking, areas in which the states have long played a primary role in regulation. Plaintiffs' proferred application of Chapter 93A to securities transactions presents a very different question. At least since 1933, Federal law has largely superseded state regulation of securities transactions. [cite omitted] This distinction causes the court to conclude that, if faced with the precise question, the Supreme Judicial Court would not extend the coverage of Chapter 93A to securities transactions.

*Conkling v. Moseley, Hallgarten, Estabrook & Weeden,* 575 F.Supp. 760, 761 (D.Mass.1983).

The *Conkling* court also noted that the McCarran–Ferguson Act specifically left the regulation of insurance to the states. *Conkling,* 575 F.Supp. at 762, *quoting* 15 U.S.C. § 1012(b) (1976).

In the ensuing years, the issue divided district courts in Massachusetts. One judge found *Conkling* persuasive and followed it. *Sweeney v. Keystone Provident Life Ins. Co.,* 578 F.Supp. 31, 35 (D.Mass. 1983). But others were not so sure. A line of cases arose holding that the Massachusetts General Court had intended the FTC clause in Chapter 93A to be a mere "guide," and that it did not effectively limit the coverage of the statute. *Hickey v. Howard,* 598 F.Supp. 1105, 1106 (D.Mass. 1984). *See also Sullivan v. Dean Witter Reynolds, Inc.,* No. 82–3300, slip op. (D.Mass.1983); *Mitchelson v. Aviation Stimulation Technology, Inc.,* 582 F.Supp. 1, 2 (D.Mass.1983); *Kennedy v. Josephtal & Co.,* No. 82–913, slip op. (D.Mass.1982).

During all this time, the Supreme Judicial Court of Massachusetts was not heard from. At length the question was presented to the United States courts yet again, whereupon the presiding district judge certified the question to the Supreme Judicial Court according to the prescribed state rule. The precise question certified was: "Does Chapter 93A of the Massachusetts General Laws apply to conduct alleged to violate Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder?" In effect, the Supreme Judicial Court was invited to decide between the *Conkling* doctrine and the *Kennedy/Hickey* approach.

The court accepted the question and came down firmly on the side of *Conkling*. *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E.2d 399 (1985). Chief Justice Hennessey, writing for a unanimous panel, stated: "We do not agree that *Dodd* and *Raymer* provide precedent for extending the reach of C.93A to the securities field." *Cabot*, 477 N.E.2d at 400. He went on to quote, with strong approval, *Conkling's* language about the preeminence of federal law in the field of securities regulation, and the corresponding limits on the prerogatives of the states. The *Cabot* court found additional support for the result from an examination of the state blue-sky law, passed almost simultaneously with Chapter 93A. While these considerations are not germane to the litigation before this Court, the language of *Cabot* indicates that the federal predominance described above would have been sufficient, standing alone, to dictate the result.

It should hardly be necessary to say that the Tennessee Supreme Court is not bound by the decisions of the courts of any sister state. It can place Tennessee in a minority of one if it wishes. The point is that neither *Skinner* nor any other case binding on the Tennessee courts *compels* such a result. As for this Court, it is of the opinion that, were the Tennessee Supreme Court to confront this issue, it is far more likely than not that Tennessee would follow the great weight of authority in finding that

such statutes "are generally held not to apply to securities." L. Loss, *Fundamentals of Securities Regulation* 799 (1986 Supp. to 1983 ed.)

In short, there was no error in this portion of the Magistrate's Report.

## V. RICO ALLEGATIONS

■ Section 1964(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), provides a private right of action for plaintiffs injured in their business by reason of a violation of the Act's substantive provisions (or "predicate acts," as they are generally called). In order to make out a valid RICO complaint, the plaintiff must allege that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). "Racketeering activity" can consist of any of the offenses enumerated in the other sections of the Act, one of which is fraud in the sale of securities.

The complaint alleges that each "tainted" sale of resort interests to each of the 366 plaintiffs constituted a separate predicate act, and that taken in the aggregate, they amounted to a "pattern of racketeering activity."

In the well-known *Sedima* decision, the Supreme Court complained of "the failure of Congress and the courts to develop a meaningful concept of 'pattern.'" *Sedima*, 473 U.S. at 500, 105 S.Ct. at 3287. Complaints like the one in the present case seem to embody the problem the Court had in mind. The Magistrate's Report, after an excellent discussion of the issues and authorities involved, concluded that if a pattern consists of "continuity plus relationship" (as suggested by the Senate Judiciary Committee before RICO's adoption), the derelictions alleged in the present case do not meet the test. The Court finds that it cannot improve on the Magistrate's analysis.[8] Accordingly, the Court adopts his rec-

---

8. It may, however, be appropriate to add that at least one court has explicitly rejected the argu-

ommendation. The RICO counts will therefore be dismissed.

## VI. RESPONDEAT SUPERIOR (WILLIAMS)

■ Inasmuch as Michael Williams has been dismissed from this action, no claim for vicarious liability based on his actions can survive his departure. Both parties admitted as much at oral argument before the Magistrate, who therefore recommended that all such claims be dismissed. The Court adopts this recommendation. Accordingly, the claims concerning Michael Williams will be dismissed.

## VII. RESPONDEAT SUPERIOR (SANDESTIN AND SANDCASTLE)

■ Plaintiffs have alleged that defendant Merrill Lynch is vicariously liable for alleged illegal acts of Sandestin and Sandcastle. Merrill Lynch argues that the pleadings do not allege an employer/employee relationship between it and its two supposed agents, or that they were acting within the scope of any employment.

This is a puzzling objection. The comprehensive amended complaint clearly charges that

[p]ursuant to the doctrine of *respondeat superior*, Merrill Lynch is liable for the unlawful acts of its agents, representatives, and affiliates including ... [Sandestin and] Sandcastle....

Plaintiff's amended complaint, ¶ 3.2(4).

While this Court has some considerable nostalgia for common-law pleading, the complaint suffices to put Merrill Lynch on notice as to the nature of the claim, and under the Federal Rules that is all that is necessary. The Magistrate properly recommended that the motion to dismiss be denied. The Court agrees.

## VIII. LIABILITY OF MERRILL LYNCH FOR ACTUAL CONSTRUCTION OF HOTEL & TOWNHOUSES

■ Merrill Lynch argues that all claims for liability against it based on the

actual construction of the hotel and townhouses should be dismissed because it took no part in that construction.

The Court agrees with the Magistrate that these claims involve issues of fact not suitable for resolution on a motion to dismiss. Therefore the motion to dismiss these claims will be denied.

## IX. SUFFICIENCY OF PLEADINGS AGAINST DEFENDANT MORTON OLSHAN

All that has been said about the applicability of § 17(a) of the 1933 Act, the RICO Act and the TCPA applies equally to the claim against Morton Olshan under these statutes. For the reasons discussed above, they will be dismissed.

The plaintiffs, on appeal, have confessed that Count V, alleging breach of contract and breach of warranty, does not state a claim against Morton Olshan. The Magistrate recommended that the count be dismissed, and the Court agrees.

■ The complaint alleges breach of fiduciary duties stemming from the erection of the resort buildings in an unsuitable location. As the Magistrate points out, the question of whether a fiduciary relationship exists between Morton Olshan and the plaintiffs is governed by Tennessee law, and the parties have not briefed the issue with appropriate references to Tennessee authority. Therefore, the Court will reserve judgment on these motions until the parties have submitted appropriate supplemental briefs.

■ The Magistrate rejected Morton Olshan's argument that the complaint did not plead common-law fraud and fraud for SEC Rule 10b–5 purposes with sufficient particularity under Rule 9(b), Fed.R.Civ.P. He also held that disputed factual questions made it inappropriate to dismiss the plaintiffs' claim that Morton Olshan was liable as a "controlling person." Finally,

---

ment that supplying a misleading prospectus to a given number of buyers generates an equal number of distinct predicate offenses under RICO. *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154 (4th Cir.1987).

he held that the plaintiffs had stated a claim for aiding and abetting, and for "seller's liability" under § 12(2) of the 1933 Act.

After reviewing the Report and the objections thereto, the Court finds that the Magistrate was correct and that nothing need be added to his discussion of these issues.

## X. CLAIMS AGAINST DEFENDANT LAVENTHOL TO DISMISS

For the reasons discussed above, the Court adopts the Magistrate's recommendation to dismiss so much of the plaintiffs' complaint against Laventhol as is predicated upon § 17(a) of the 1933 Act, the RICO Act, or the TCPA.

■■■ The gravamen of the SEC Rule 10b–5 claim against Laventhol is that, in preparing estimates of future rental income for the PPM, these defendants relied upon assumed inflation rates that were much higher than the actual rate of inflation turned out to be. The Magistrate noted at the outset that the complaint fails to allege scienter, a necessary element of a SEC Rule 10b–5 action. Indeed, it is by no means clear how Laventhol could have had scienter, since it was predicting a future event. The complaint makes sense only on the premise that the accountants should have known that reliance on the high inflation projections was unreasonable. Thus, the complaint in substance is one for negligence.

> In any case, the PPM clearly states that [t]he projected inflated average room rates could be materially different if significantly higher or lower rates of inflation are actually experienced. Since the actual rates of inflation *cannot be predicted with any degree of certainty, no assurance is given* that the projected average room rates will not *vary materially* from those shown above. (emphasis added)

PPM, I–3.

■■■ For anyone who can read, this seems a clear warning that the forecast of rental income was highly speculative and in some measure contingent upon uncontrolla-

ble future events. To say nothing more, it certainly "bespeaks caution" in the language of the leading case of *Luce v. Edelstein*, 802 F.2d 49, 56 (2d. Cir.1986), and this is enough to insulate defendant Laventhol from liability. The Court agrees with the Magistrate that the complaint, as pleaded, fails to state a SEC Rule 10b–5 claim against Laventhol, but also agrees that the ruling on the motion to dismiss should be reserved until the plaintiffs have had the benefit of additional discovery and leave to amend. The reasons for this will be discussed below.

■■■ The complaint also charges Laventhol with "controlling person" liability under § 15 of the 1933 Act (15 U.S.C. § 77o ), which states:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 11 or 12, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

The Magistrate found that the complaint alleged only that the accountants were employed to make financial projections, market studies, and feasibility reports, and that this fell far short of the "actual participation" required to state a claim for "controlling person" liability. Having reviewed the Report and objections, the Court agrees with the Magistrate.

■■■ The Court also agrees with the Magistrate's conclusion that the plaintiffs have failed to state a claim for aiding and abetting against Laventhol.

But a finding that several of the claims, in their present forms, are maladroitly pleaded is not the end of the matter. It is

necessary to decide whether to grant leave to amend.

In considering this question, the Court must keep its eye on the well-known policy of the Federal Rules that leave to amend will be liberally granted where such would serve the ends of justice. Under Rule 9(b), dismissal without granting leave to amend is ordinarily improper "unless it appears beyond doubt that plaintiff can prove no set of facts ... that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). As the Magistrate observed, this is not such a case.

True, the Comprehensive Amendment Complaint is the plaintiffs' fifth attempt to state their claims. It is tempting to invoke the ancient common law maxim "enough is enough" and hold that six bites at the apple would be too many.[9] However, as the Magistrate points out, the plaintiffs were presumably unaware of the nature of the deficiency of their pleadings. Patience is therefore the order of the day.[10]

The Magistrate's solution—reservation of a ruling on all the surviving claims pending completion of ninety days of discovery and amendment of the complaint—is reasonable, and will be adopted.

■ The Court also agrees that until the remaining federal claims are disposed of, any action on motions relating to pendent state claims would be premature.

## XI. CLAIMS AS TO DEFENDANT DOMINION

As with the other defendants, the Magistrate recommended that all claims against Dominion based on § 17(a) of the 1933 Act, the RICO Act, and the Tennessee Consumer Protection Act be dismissed. For the reasons discussed *supra,* the Court agrees.

■ The complaint also alleges that Dominion Federal is liable as a principal under SEC Rule 10b–5, as a "controlling person," and as an aider and abetter. The Magis-

trate found that the facts alleged were insufficient to state a claim against Dominion. After reviewing the Report and the objections, the Court finds that the Magistrate is correct, and that nothing need be added to his discussion of the issues.

■ As with Laventhol, the Magistrate recommended that the plaintiffs be granted leave to amend and that a ruling on the motions to dismiss the securities claims be reserved pending additional discovery and the filing of the new complaint. It will be so ordered.

As with Laventhol, the Court will not address any pendent state claims until the picture regarding the federal claims becomes clearer.

## XII. DEFENDANTS' COUNTERCLAIM

■ Several defendants filed a counterclaim charging that the plaintiffs have tortiously interfered with their prospective business advantages by filing a groundless civil action (*i.e.,* the present one). As the Magistrate noted, it is not certain whether, or under what conditions, Tennessee recognizes this tort. However, it is not necessary to decide these issues, since the Magistrate is surely right in concluding that if the tort exists, and if a groundless lawsuit can serve as a basis for it, the proper vehicle for asserting it can *never* be a counterclaim during the life of the allegedly meritless suit. Mere common sense teaches us that if a frivolous or malicious suit is to be considered tortious, there must be some sort of judgment on the merits disposing of that suit. To hold otherwise might deter plaintiffs from filing meritorious actions. The Counterclaim will accordingly be dismissed.

An appropriate order will be entered.

## ORDER

In accordance with the memorandum contemporaneously filed, the following claims are dismissed from this action:

---

9. Indeed, one defendant (Dominion) has filed a limited objection to that effect.

10. However, the Court's patience as to amendments will be exhausted with the sixth bite, and plaintiffs are so noticed.

1. Plaintiffs' claims against all defendants under § 17(a) of the Securities Act of 1933;

2. Plaintiffs' claims against all defendants under the Tennessee Consumer Protection Act; and

3. Plaintiffs' claims against all defendants under the Racketeer Influenced and Corruption Organization Act (RICO).

As to defendant Merrill Lynch, the motion to dismiss (filed March 6, 1987; Docket Entry No. 152) is granted as to the claims of vicarious liability based on the conduct of Michael Williams, and denied as to all claims not based on § 17(a) of the Securities Act of 1933, the RICO Act, or the Tennessee Consumer Protection Act.

With regard to defendant Morton Olshan, the motion (filed March 6, 1987; Docket Entry No. 150) to dismiss plaintiffs' claims for breach of contract and breach of warranty under Count V of the Comprehensive Amended Complaint is granted.

With regard to defendant Laventhol & Horwath, the Court will reserve a ruling on the motion to dismiss (filed March 6, 1987; Docket Entry No. 141) insofar as it pertains to claims not based on § 17(a) of the Securities Act of 1933, the RICO Act, or the Tennessee Consumer Protection Act, pending the completion of an additional ninety (90) days of discovery and the filing of an amended complaint.

As to defendant Dominion Federal Savings and Loan Association, the Court reserves ruling on the motion (filed March 6, 1987; Docket Entry No. 146) to dismiss as to all claims not based on § 17(a) of the Securities Act of 1933, the RICO Act, or the Tennessee Consumer Protection Act, pending the completion of an additional ninety (90) days of discovery and the filing of an amended complaint.

Plaintiffs' motion (filed April 10, 1987; Docket Entry No. 175) to dismiss the defendants' counterclaim is granted. Accordingly, the counterclaim is dismissed.

It is so ORDERED.

## REPORT AND RECOMMENDATION

KENT SANDIDGE, III, United States Magistrate.

By Order entered March 12, 1987, the Court referred the following motions to the undersigned for consideration, submission of proposed findings of fact and recommendations for disposition:

1) motion (filed March 6, 1987) of defendant Morton Olshan to dismiss;

2) motion (filed March 6, 1987) of defendant Dominion Federal Savings & Loan Association to dismiss or alternatively for summary judgment;

3) motion (filed March 6, 1987) of defendant Michael D. Williams to dismiss;

4) motion (filed March 6, 1987) of defendant Laventhol & Horwath to dismiss;

5) motion (filed March 6, 1987) of defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. to dismiss or alternatively for summary judgment; and

6) motion (filed March 6, 1987) of defendants Sandestin Beach Hotel, Inc., Sandcastle Resort at Sandestin, Inc., Frank Flautt, Jr., William Jeffries Mann, Wilton D. Hill, Fred V. Alias, William Alias, and Robert Kamm for summary judgment.

On March 3, 1988, the undersigned heard argument on the motions of defendant Morton Olshan, defendant Dominion Federal Savings & Loan Association, defendant Laventhol & Horwath, and defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.[1] In addition, argument was heard on the motion of plaintiffs to dismiss the counter-

1. On October 1, 1987, plaintiffs filed a notice of voluntary dismissal as to defendant Michael Williams, thereby mooting the motion of defendant Michael D. Williams to dismiss.

Argument on the motion of the Sandestin Beach Hotel defendants for summary judgment was reserved pursuant to the Court's Order of May 14, 1987, regarding scheduling and case management. That Order provides, at paragraph 10 that, "the Court shall reserve ruling on any pending motions for summary judgment until the parties have had a reasonable opportunity to complete discovery pertaining to such motions." Because the stay of discovery has not yet been lifted, the motion of the Sandestin Beach Hotel defendants for summary judgment is not ripe for consideration at this time.

claim of defendants, which was referred to me by Order entered May 12, 1987.

## I.

This is an action brought by 113 plaintiffs[2] for fraud and other unlawful acts under federal and state securities laws, the Racketeer Influenced and Corrupt Organization Act ["RICO"], 18 U.S.C. § 1961 *et seq.*, and state law, arising out of the plaintiffs' December, 1984, purchase of hotel interests in the Sandestin Beach Hilton Hotel ["Hotel"] in Destin, Florida. The Hotel contains 400 rooms, is a 15-story resort, and is structured as a condominium regime in which each plaintiff purchased fee simple title to an individual hotel room as well as an undivided proportionate interest in the Hotel's common areas.

The allegations in the complaint[3] are primarily based upon the contents of a Private Placement Memorandum ["PPM"], attached to the complaint as Exhibit 1. The PPM is comprised of: 1) the "legal document," a formal disclosure document that purports to contain the disclosures required by the securities laws; 2) a collection of exhibits to the legal document; and 3) a brochure containing photographs, drawings, and narrative descriptions of various aspects of the hotel.

Plaintiffs claim that the PPM was and is legally deficient in that it omits to disclose material facts. Plaintiffs also allege that the PPM includes affirmative misrepresentations of fact. These deficiencies, as alleged in the complaint, generally concern the following subject matter:

a) statements concerning the position, orientation, and location of the hotel on the beach and the view from each hotel room;

b) statements concerning the profits realized by the developers from the sale of hotel interests;

c) financial projections concerning the expected profitability of the hotel;

d) the adequacy of the hotel's structural facilities; and

e) miscellaneous internal inconsistencies in the sales presentation materials and other inadequate disclosures regarding desirability and investing in hotel interests.

In addition to these specific inadequacies of the PPM, plaintiffs also allege oral misrepresentations made to plaintiffs concerning the same subject matter as set forth above.

For these alleged misrepresentations, plaintiffs sue defendants under the following theories and statutes: state and federal securities laws, RICO, the Tennessee Consumer Protection Act, fraudulent and negligent misrepresentation, breach of contract and breach of warranty, breach of fiduciary duty, negligence, and constructive trust. As will become clear later, all defendants are not sued under each and every theory and/or statute.

The complaint names 14 persons as defendants in this action. Those defendants which have filed motions presently under review are identified in the complaint as follows:

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ["Merrill Lynch"], is engaged in business as a securities broker-dealer. Pursuant to an agreement with the Sandestin Beach Hotel ["SBH"],[4] Merrill Lynch acted as the exclusive selling agent for the sale of hotel interests to all investors in the hotel. Merrill Lynch substantially participated in preparing the PPM and the sales

---

**2.** This case was originally filed in the Middle District of Tennessee by three Tennessee residents. As the case grew to 113 plaintiffs, the companion case, *McInnis v. Merrill Lynch,* 706 F.Supp. 1355 was transferred to this District from The Northern District of Alabama at Birmingham. Unlike *Nichols, McInnis* has been certified as a class action.

**3.** By "complaint" is meant the Comprehensive Amended Complaint filed by plaintiffs on January 30, 1987.

**4.** SBH is a defendant, and is a Florida corporation with its principal place of business in Destin, Florida. SBH was formed to develop the hotel and to manage the hotel's room rental operations. SBH was responsible for structuring the hotel's condominium regime and was responsible for all aspects of the development, construction and financing of the hotel.

presentations made to the plaintiffs to induce them to purchase hotel interests.

Defendant Dominion Federal Savings & Loan Association ["Dominion Federal"], is a savings and loan association with its principal place of business in Tysons Corner, Virginia. Prior to the plaintiffs' purchases of their hotel interests, Dominion Federal entered into a commitment with SBH and Merrill Lynch by which Dominion Federal agreed to make loans available to those persons who sought to borrow money to finance the purchase of their hotel interests.

Defendant Laventhol & Horwath is a partnership of certified public accountants having its principal place of business in Tampa, Florida. Prior to the sale of hotel interests to the plaintiffs and prior to preparation of the PPM, Laventhol & Horwath was retained by SBH or its affiliates to prepare financial projections and a market study to determine the feasibility of constructing the hotel and financing the hotel through the sale of hotel interests. Laventhol & Horwath substantially participated in preparing the financial projections set forth in the PPM.

Defendant Morton Olshan is a resident of New York, and since prior to February, 1983, has been Vice President, a director and a shareholder of SBH. The plaintiffs allege, upon information and belief, that Mr. Olshan owns more shares of SBH stock than any other shareholder. Mr. Olshan provided funds to SBH to initiate the development of the hotel and, through the provision of such funds, made it possible for SBH and its affiliates to proceed with development of the hotel and sales of hotel interests to the plaintiffs.

In addition to these defendants who have filed motions to dismiss, plaintiffs have filed a motion to dismiss the counterclaim of certain individual defendants. The defendants (counterplaintiffs) who filed the counterclaim are identified in the complaint as follows:

Defendant and counter-plaintiff Frank L. Flautt, Jr. is a resident of Memphis, Tennessee. Since prior to February, 1983, Mr. Flautt has been President, a director and a shareholder of both SBH and Sandcastle.[5] Mr. Flautt is alleged to be the principal individual responsible for developing the hotel, including formulating the financing plan, offering and selling hotel interests, and managing the entire development project.

Defendant and counter-plaintiff William Jeffries Mann is a resident of Memphis, Tennessee. Since prior to February, 1983, he has been Vice President, a director, and a shareholder of SBH.

Defendant and counter-plaintiff Wilton D. Hill is a resident of Memphis, Tennessee. Since prior to February, 1983, he has been the Secretary/Treasurer, a director and a shareholder of SBH.

Defendant and counter-plaintiff Fred V. Alias, is a resident of Destin, Florida. Since prior to February, 1983, he has been a shareholder, an officer and a director of Sandcastle and Sandestin Beach Resorts, Inc., both of which corporations are affiliated with SBH.

Defendant and counter-plaintiff William Alias, Jr. is a resident of Destin, Florida. Since prior to February, 1983, he has been a shareholder, an officer and a director of Sandcastle and Sandestin Beach Resort, Inc.

Defendant and counter-plaintiff Robert Kamm is a resident of Memphis, Tennessee. Mr. Kamm is Vice President of Sandcastle and is also the Vice President of Finance for Flautt Properties, formerly Flautt and Mann Properties, a corporation controlled by defendant Frank Flautt and operated for the purpose of developing and managing real property.

I will now address the pending motions. The standard for all motions is that dismissal is improper unless it appears beyond

---

**5.** Defendant Sandcastle is an affiliate of SBH and was responsible, along with SBH, for devising the plan by which the hotel was developed, financed, and managed. Sandcastle, pursuant to the COA Management Agreement, is responsible for managing the hotel's common area operations. This management arrangement was established prior to construction of the hotel and prior to the plaintiffs' purchase of their hotel interests.

doubt that plaintiffs can prove no set of facts in support of a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## MOTION OF DEFENDANT MERRILL LYNCH TO DISMISS

### I.

### Particularity of Plaintiffs' Fraud Allegations

Plaintiffs' claims which are asserted against Merrill Lynch are, for the most part, premised upon allegations of fraud. Defendant argues the complaint should be dismissed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure for failure to plead fraud with particularity.

Rule 9(b) of the Federal Rules of Civil Procedure requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A properly-pled allegation of fraud must identify "the time, place and content of the alleged misrepresentations upon which [the plaintiff] relied." *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984). A complaint which fails to supply the specificity requied by Rule 9(b) is subject to dismissal. *Kellman v. ICS, Inc.*, 447 F.2d 1305 (6th Cir.1971).

Rule 9(b) must be "harmonized and reconciled" with Rule 8 of the Federal Rules of Civil Procedure which requires a pleading to contain a short and plain statement of the claims asserted. *Michaels Building Co. v. Ameritrust Co., N.A.*, 848 F.2d 674 (6th Cir.1988); *Temple v. Haft*, 73 F.R.D. 49 (D.Del.1976). Nevertheless, conclusory allegations of fraud are insufficient. *Id.,* at 53; *see also In re: AM International Inc. Securities Litigation*, 597 F.Supp. 1117 (S.D.N.Y.1984).

Plaintiffs' complaint meets the requirements of Rule 9 with respect to the allegedly fraudulent representations and omissions in the PPM. Plaintiffs allege that

"Merrill Lynch substantially participated in preparing the PPM." Complaint at ¶ 3.2. Plaintiffs reference and attach the PPM as an exhibit to the complaint, and detail with particularity what material facts were omitted from the PPM, and what false misrepresentations were allegedly made. The Second Circuit has held that reference to the offering memorandum satisfies Rule 9(b)'s requirements as to identification of the time, place and content of the alleged misrepresentations. *Luce v. Edelstein*, 802 F.2d 49 (2d Cir.1986). As plaintiffs have referenced the PPM, and indeed attached it to the complaint, they have satisfied the requirements of Rule 9(b).[6]

Plaintiffs' assertion that certain defendants, including the agents of Merrill Lynch, made oral misrepresentations at sales presentations presents a more difficult question. Although defendant is apprised of the content of the alleged fraudulent misrepresentations, plaintiffs have not referred to exact dates and locations where the alleged fraud occurred. Instead, plaintiffs have referred only to continuous misrepresentations at sales presentations over a period of time.

I would not suggest that other plaintiffs pattern their pleadings after the one at bar. However, I must conclude that plaintiffs have satisfied the minimal pleading requirements under Rule 9(b), and that to list each presentation in which fraud allegedly occured would add countless details to the already lengthy pleadings. *See Kimmel v. Peterson*, 565 F.Supp. 476, 479–82 (E.D.Pa. 1983); *Kaufman v. Magid*, 539 F.Supp. 1088, 1093 (D.Mass.1982). Defendant has been given notice of the general allegations of fraud at these sales presentations, and a general approximation of the time period in which the presentations occurred, and may, through discovery, obtain the exact dates and locations of the sales presentations if necessary. Plaintiffs contend that many of the misrepresentations at the sales presentations have been reduced to written form.

---

**6.** Even were reference alone insufficient, plaintiffs have provided Merrill Lynch with the date the PPM was issued (Complaint at ¶ 2.5), the content of the fraud (Complaint at ¶ 4.1 *et seq.*), and the place of the fraud (Complaint at ¶ 1.2).

Defendant may, therefore, be guided by those representations which are in writing.

I therefore recommend that defendant's motion to dismiss based on plaintiffs' failure to plead fraud with particularity be denied.

## II.

### Section 17(a) of the Securities Act of 1933

Under Section 17(a) of the Securities Act of 1933, it is a violation to engage in any scheme to defraud in connection with the sale of a security.[7] Defendants move for dismissal of the security claims filed pursuant to § 17(a) on the ground that § 17(a) does not provide for a private cause of action. While the issue is largely unsettled, the undersigned determines that no private right of action exists.

Section 17(a) grants no explicit private cause of action. *Jones v. First Equity Corp. of Florida,* 607 F.Supp. 350 (E.D. Tenn.1985). And, the Circuits are split as to whether an implied private right of action exists. The Second, Fourth, Seventh and Ninth Circuits recognize the right; the Fifth and Eighth Circuits do not. *See generally, Mosher v. Kane,* 784 F.2d 1385, 1390–91 n. 9 (9th Cir.1986).

The Supreme Court has recognized the split among the Circuits, but has declined to decide the issue on at least four occasions. *See Eichler v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 2625 n. 9, 86 L.Ed.2d 215 (1985); *Herman and Maclean v. Huddleston,* 459 U.S. 375, 378, n. 2, 103 S.Ct. 683, 685, n. 2, 74 L.Ed.2d 548 (1983); *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 557, n. 9, 99 S.Ct. 790, 795, n. 9, 58 L.Ed.2d 808 (1979); *Blue Chip Stamps v. Manor Drugstores,* 421 U.S. 723, 733, n. 6, 95 S.Ct. 1917, 1924, n. 6, 44 L.Ed.2d 539 (1975).

The Sixth Circuit has not definitively decided the issue. Although in a number of cases the Court has assumed that a cause of action exists, *see Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 1194 (6th Cir.1981); *Herm v. Stafford,* 663 F.2d 669 (6th Cir.1981); *Nickels v. Koehler Management Corp.,* 541 F.2d 611 (6th Cir.1976), in the most recent of these decisions, the Court explicitly acknowledged the disagreement among the Circuits and refused to decide the issue because it had not been raised on appeal. *Herm,* 663 F.2d at 678, n. 12. More recently, the Court has expressed reservation with regard to the existence of an implied private right of action under Section 14(a) of the federal securities acts. *See Rauchman v. Mobil Corp.,* 739 F.2d 205 (6th Cir.1984).

At the District Court level, there seems to be agreement in Tennessee that no private right exists. *See Akers v. Bonifasi,* 629 F.Supp. 1212, 1222 (M.D.Tenn.1984); *Russell v. Travel Concepts Corp.,* 75–76 Fed.Sec.L.Rep. (CCH ¶ 95, 230) (M.D.Tenn. 1975) [1975 WL 401]; *Media General v. Tanner,* 625 F.Supp. 237 (W.D.Tenn.1985); *Jones v. First Equity Corp. of Florida,* 607 F.Supp. 350 (E.D.Tenn.1985); *Memphis Housing Authority v. Paine, Webber, Jackson & Curtis, Inc.,* 639 F.Supp. 108 (W.D.Tenn.1986). These decisions rely, in large part, on the Fifth Circuit decision, *Landry v. All American Assurance Co.,* 688 F.2d 381, 384–391 (5th Cir.1982), and the four-pronged test set forth by the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

In *Cort,* the Supreme Court listed these factors to consider in determining whether an implied private right of action exists:

---

7. Section 17(a) provides:

   It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
   1) to employ any device, scheme, or artifice to defraud, or
   2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

   15 U.S.C. § 77q(a).

1) is the plaintiff a member of the class for whose benefit the statute was enacted;

2) is there a legislative intent to indicate creation of the remedy;

3) is implying the remedy consistent with the legislative scheme; and

4) is the cause of action one traditionally relegated to state law.

422 U.S. at 78, 95 S.Ct. at 2087.

Particular weight is to be accorded to legislative intent. *See generally, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). If legislative intent is lacking, the other three factors need not be considered. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979). And, a Court should consider three factors in discerning legislative intent: 1) the language of the statute; 2) its legislative history; and 3) its place in the legislative scheme. *See Transamerica Mortgage Advisors v. Lewis, supra.*

In considering these factors, it seems that Congress did not intend to create a private right of action for claims filed pursuant to Section 17(a). A discussion of the reasons supporting this view is found in *Jones,* which relies heavily on a District Court opinion from the Eastern District of Kentucky, *Ingram Industries, Inc. v. Nowicki,* 502 F.Supp. 1060 (E.D.Ky.1980). *See also, Kimmel v. Peterson,* 565 F.Supp. 476, 481 (E.D.Pa.1983). Plaintiffs have not cited, nor has my own research revealed, any decision to indicate that Congress had a different intent in enacting Section 17(a). I therefore find the reasoning of these decisions persuasive. Under a *Cort* analysis, plaintiffs cannot show that a private right of action exists under Section 17(a).[8]

In view of the Sixth Circuit's recent reservations with respect to implying a private right of action under the securities laws, the trend in Tennessee (including this Court) not to recognize such a right, and the fact that the courts which have not found a private right of action have thoroughly examined the question by applying the *Cort* analysis and examining Congressional intent, I recommend that the Court dismiss plaintiffs' claims under Section 17(a).

### III.

### Statute of Limitations of Section 12(2) Claims

Plaintiffs have alleged in their complaint that defendant's actions violated Section 12(2) of the Securities Act. Defendant moves to dismiss this claim on the ground that the claim was not timely filed.

The statute of limitations for a Section 12(2) claim is set forth in Section 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r(c), which provides:

> No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.

The question here turns on when the statute began to run.

On this issue, defendant argues that the statute began to run when the plaintiffs entered into a binding commitment to undertake the transaction, or, sometime between February, 1983, and August, 1983. Plaintiffs, on the other hand, argue that the pivotal date is December, 1984, when the sale of hotel interests to each individual plaintiff was made, or alternatively, when plaintiffs discovered the fraud, which plaintiffs contend is a question of fact.

The original Complaint in this action was filed May 30, 1986. The date upon which the statute began to run is a question of fact precluding dismissal of plaintiffs' Section 12(2) claims at this time. *Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 813 (9th Cir.1981); *Lewelling v. First California Co.,* 564 F.2d 1277, 1280 (9th Cir.

---

**8.** Of the Circuits that have examined whether Section 17(a) provides a private cause of action, only the Fifth Circuit has applied the *Cort* test.

1977). I therefore recommend that the Court deny this aspect of defendant's motion.

## IV.

### Statute of Limitations on Section 10(b) and Rule 10b–5 Claims

Plaintiffs have alleged in their complaint that defendant's actions violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission. Defendants move to dismiss these claims on the ground that they were not timely filed.

Section 10(b) does not contain an express private right of action, and thus, does not have an express statute of limitations period. In such a case a statute of limitations must be borrowed from Tennessee state law. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Silverberg v. Thomson McKinnon Securities, Inc.,* 787 F.2d 1079 (6th Cir. 1986). The statute of limitations borrowed should be the one which best effectuates the purpose of the federal securities laws. *Carothers v. Rice,* 633 F.2d 7 (6th Cir. 1980). Normally, the statute of limitations is the statute applicable to the state cause of action which most nearly resembles the federal cause of action. *See Carothers,* 633 F.2d at 12.

The Sixth Circuit has yet to rule on a limitations period for actions brought under Section 10(b) of the 1934 Act in Tennessee. And, the District Courts in Tennessee are in disagreement as to which statute applies. The Western District has ruled that the three-year statute of limitations applicable to Tennessee common law fraud and deceit claims governs Section 10(b) claims. *Media General, Inc. v. Tanner,* 625 F.Supp. 237 (W.D.Tenn.1985). The Eastern District arrived at an opposite conclusion in *Haney v. Dean Witter Reynolds, Inc.,* Dock. No. CIV–1–85–531 (E.D.Tenn. Aug. 20, 1986).

Most recently, Judge Nixon, writing for this Court, adopted the rule articulated in *Haney,* and held that Section 48–2–121 of the Tennessee Code Annotated is the State statute that is most analogous to Rule 10b–5. *Ockerman v. May Zima,* 694 F.Supp. 414 (M.D.Tenn.1988). By so holding, this Court held that the applicable statute of limitations is set forth in Section 48–2–122(h) of the Tennessee Code Annotated, which provides:

No action shall be maintained under this section unless commenced before the expiration of two (2) years after the act or transaction constituting the violation or the expiration of one (1) year after the discovery of facts constituting the violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires.

T.C.A. § 48–2–122(h).

In *Ockerman,* the undersigned previously considered and recommended that the Court adopt the three-year statute of limitations applicable to Tennessee common law fraud and deceit claims. *See Ockerman,* Report and Recommendation of October 9, 1987. In reaching that decision, I was persuaded by the Western District's opinion in *Media General,* and the Sixth Circuit's holding that when the Blue Sky law and common law deceit statutes are roughly similar to a Rule 10b–5 action, the longer statute of limitation applies. *Herm,* 663 F.2d at 678; *Carothers,* 633 F.2d at 14. In *Herm,* the Court held that the longer statute of limitations better effectuates the broad remedial purposes of the federal securities laws. *Herm,* 663 F.2d at 678.

The Court having rejected this position, however, I must now retreat from that earlier position. It is desirable, even necessary that there be certainty and uniformity regarding the application of statute of limitations to actions under Rule 10b–5 within each state. *See Carruthers Ready Mix, Inc. v. Cement Masons Local Union No. 520,* 779 F.2d 320 (6th Cir.1985); *Nickels,* 541 F.2d at 614. *A fortiori,* it is desirable that uniformity exist within the same court. Accordingly, I must now recommend that T.C.A. § 48–2–122(h) should gov-

ern plaintiffs' 10(b) and 10b–5 claims.[9]

Having determined that Section 48–2–122(h) provides the applicable statute of limitations, the undersigned now must consider when the statute began to run. Defendant argues that the statute began to run on September 6, 1983, the date of closing, which is more than two years before this action was instituted on May 30, 1986. Plaintiffs contend that the statute did not begin to run until December, 1984, the date of the sale of hotel interests to plaintiffs, or when the fraud was discovered, which plaintiffs argue is a question of fact. In either case, plaintiffs argue that the Rule 10b–5 claims were filed within the appropriate limitations period.

The date upon which the statute began to run is a question of material fact as demonstrated above. *See Stephenson,* 652 F.2d 813; *Lewelling,* 564 F.2d 1280. Accordingly, the undersigned recommends that the Court deny this aspect of defendant's motion as a genuine issue exists for trial.

## V.

### Tennessee Consumer Protection Act

Plaintiffs allege in Count III of the Comprehensive Amended Complaint that defendants engaged in unfair or deceptive acts or practices in the marketing and sale of securities, in violation of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.* Defendants argue that the Tennessee Consumer Protection Act ["TCPA"] does not apply to the sale of securities, and that therefore, this claim should be dismissed.

Whether the TCPA covers the sale of securities is a question of first impression in the State of Tennessee. Because the Tennessee courts have not addressed this issue, this Court must ascertain what the Tennessee Supreme Court would decide if confronted with the question. *Lindner v. Durham Hosiery Mills, Inc.,* 761 F.2d 162, 165 (4th Cir.1985). Relevant to the inquiry is the legislative intent in enacting the TCPA, congressional and legislative intent behind the securities laws, and case law from other jurisdictions in which similar statutes have been construed. Upon due consideration, I conclude that the TCPA does not apply to the sale of securities.

### A.

The TCPA of 1977 protects "consumers and legitimate business enterprises from unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within the state...." T.C.A. § 47–18–102(2). Section 47–18–104(b) enumerates more than 20 unlawful acts or practices. Nowhere does the Act specifically allude to securities. It is urged, however, that securities fraud is covered by the Act by virtue of § 47–18–104(b)(26), which declares as unlawful: "Engaging in any other act or practice which is deceptive to the consumer...."

The TCPA provides a private right of action to persons harmed by acts or practices declared unlawful. T.C.A. § 47–18–109. Significant to the issue at bar, it awards treble damages to "willful or knowing" violaters. T.C.A. § 47–18–109(a)(3).

Exempted from coverage of the TCPA are:

Acts or transactions required or specifically authorized under the laws administered by or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States....

T.C.A. § 47–18–111(a)(1).

As to the construction of the Act, Section 47–18–115 provides:

---

**9.** The parties have not had the opportunity to argue, so I have not considered, the Third Circuit's recent decision, *In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir. 1988). In that case, the Third Circuit determined that, rather than borrowing a limitations period from state law for complaints asserting violations of Section 10 and Rule 10b–5, the uniform period found in the companion provisions of the 1934 statute, which is one year after discovery of facts constituting the violation and in no event more than three years after such violation, is the appropriate limitations period. The decision is sound and persuasive. However, due to the possible retroactivity concerns if applied to this litigation, I decline to consider the decision without briefs from counsel.

This part, being deemed remedial legislation necessary for the protection of the consumers of the state of Tennessee and elsewhere, shall be construed to effectuate the purposes and intent thereof. *It is the intent of the general assembly that this part shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act* (15 U.S.C. 45(a)(1)).

T.C.A. § 47–18–115 (emphasis added).

### B.

The parties and the State [10] have exhaustively briefed the issue of whether securities are exempted from the TCPA by virtue of T.C.A. § 47–18–111. Sound arguments have been advanced by all parties. I think, however, that the arguments are misplaced. I believe the critical issue here is not whether securities are exempted from the TCPA by virtue of Section 47–18–111, but rather, whether securities are exempted from the TCPA by virtue of Section 47–18–115.

Section 47–18–104(a) of the TCPA is patterned after Section 5 of the Federal Trade Commission ["FTC"] Act, 15 U.S.C. § 45(a)(1) (1982). The Tennessee General Assembly has therefore deemed it appropriate to look to the FTC and federal decisions interpreting the FTC Act for guidance in construing the scope and meaning of the TCPA. T.C.A. § 47–18–115. Significantly, no federal court has applied Section 5(a)(1) of the FTC Act to securities transactions. *Lindner*, 761 F.2d at 167. This is because, since its inception, the Securities and Exchange Commission, rather than the FTC, has been responsible for regulating securities transactions. *See* Section 78ii, Act of June 6, 1934, c. 404, Title II, § 210, 48 Stat. 908. The Fourth Circuit, the District Court of Massachusetts, and the Supreme Court of South Carolina, have all held that securities transactions are exempted from the scope of state consumer protection acts since this has been the interpretation given by the FTC and federal courts to Section 5(a)(1) of the FTC Act. *See Lindner*, 761 F.2d at 167; *Conkling v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 575 F.Supp. 760, 761 (D.Mass. 1983); *State v. Rhoades*, 275 S.C. 104, 267 S.E.2d 539 (1980).

I am persuaded by these decisions, and am of the opinion that Section 47–18–115, standing alone, precludes the application of the TCPA to securities transactions. I do not believe, however, that Section 47–18–115 is the only basis for holding that the TCPA does not apply to securities transactions.

To begin with, application of the TCPA to securities transactions would create remedies that neither Congress nor the Tennessee legislature included in the federal or state securities laws. Securities transactions are comprehensively regulated by the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (1982), the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (1982), and the Tennessee Blue Sky laws, T.C.A. §§ 48–2–101 *et seq.* "If Congress or the Tennessee legislature wanted to expose securities violators to the punitive spectre of treble damages, they would have, and could have, so provided." *Moore v. A.G. Edwards & Sons, Inc.*, 631 F.Supp. 138 (E.D. La.1986). Instead, Congress chose to limit a plaintiff's recovery to "actual damages," 15 U.S.C. § 77k(e), 78bb(a), and 78r(a), and Tennessee has followed suit. T.C.A. § 48–2–122. I decline to recommend that the Court extend the remedies available in a securities fraud action when Congress and the Tennessee legislature have both declined to do so explicitly.

Support for this conclusion is also drawn from the case law of other jurisdictions. Almost all state and federal courts construing similar statutes have held that consumer protection acts do not apply to security transactions. *Lindner*, 761 F.2d 162; *Moore*, 631 F.Supp. 138; *Skinner v. E.F. Hutton & Co.*, 314 N.C. 267, 333 S.E.2d 236 (1985); *In re Catanella and E.F. Hutton*

---

**10.** Due to the State's substantial interest in this question, an *amicus curiae* brief has been filed by the Office of the Attorney General and Reporter. The State argues, as do plaintiffs, that T.C.A. § 47–18–111 does not exempt securities from the scope of the TCPA.

*& Co. Securities Litigation*, 583 F.Supp. 1388 (E.D.Pa.1984); *Robertson v. White*, 633 F.Supp. 954 (W.D.Ark.1986); *Allais v. Donaldson, Lufkin & Jenrette*, 532 F.Supp. 749 (S.D.Texas 1982); *State v. Piedmont Funding Corp.*, 119 R.I. 695, 382 A.2d 819 (1978); *State v. Rhoades*, 267 S.E.2d 539; *Kittilson v. Ford*, 23 Wash. App. 402, 595 P.2d 944 (1979), *aff'd* 93 Wash.2d 223, 608 P.2d 264 (1980); *Cabot Corp. v. Baddour*, 394 Mass. 720, 477 N.E. 2d 399 (1985); *see also Singer v. Dean Witter Reynolds, Inc.*, 614 F.Supp. 1141 (D.Mass.1985) (Massachusetts Consumer Protection statute did not apply to commodities transactions).

The reasoning in these decisions has, not surprisingly, varied. Some courts have relied on the interpretation given to the FTC Act, others have relied on specific exemption provisions of the Act (such as T.C.A. § 47–18–111, or one similar), others have noted the inconsistencies of the state consumer protection acts and the securities laws. In all cases, however, the courts have implicitly, if not explicitly, recognized the fact that securities transactions are already extensively regulated by both federal and state laws. Due to this extensive regulation, these courts have uniformly recognized that there is no need for further regulation under the state consumer protection laws. Indeed, most courts have implicitly recognized that further regulation would contravene the spirit and purpose of the already existing securities laws. [One could cite this as the "enough is enough" view.]

In short, I believe the Tennessee Supreme Court would hold, if presented with this issue, that securities transactions are exempted from the TCPA. This determination is consistent with the overriding majority of state and federal court opinions which have considered the issue, the absence of any federal court decision holding that securities transactions are subject to Section 5(a)(1) of the FTC Act, and congressional and legislative intent. I do not believe that the Tennessee legislature would have intended the TCPA, with its treble damages provision, to apply to securities transactions already subject to pervasive and intricate regulation under the Tennessee Blue Sky law, as well as the Securities Act of 1933, and the Securities Exchange Act of 1934.

I respectfully recommend that the Court dismiss plaintiffs' claims under the Tennessee Consumer Protection Act.[11]

## VI.

### RICO

Plaintiffs allege in Count II of the Comprehensive Amended Complaint that certain activities of defendants constitute separate and distinct instances of "fraud in the sale of securities, wire fraud and mail fraud," and therefore constitute "racketeering activity" as that term is defined under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, *et seq.* ["RICO"]. Defendant argues, *inter alia*, that Count II should be dismissed for plaintiffs' failure to allege a "pattern of racketeering activity." The undersigned agrees.

Section 1964(c) of RICO provides a civil remedy to plaintiffs injured in their business or property by reason of a RICO violation. The United States Supreme Court has enumerated the essential elements which must be alleged to recover on a civil RICO claim:

(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering ac-

---

11. In making this recommendation, I am mindful that the State Attorney General's Office has reached an opposite conclusion. This would indeed prove troublesome had the State considered the TCPA in light of T.C.A. § 47–18–115, as well as T.C.A. § 47–18–111. The State did not, however. Instead, the issue at bar was only analyzed by the State in terms of T.C.A. § 47–18–111.

The reasoning of the insurance cases cited by the State makes an interesting argument that securities are not exempted from the TCPA by virtue of T.C.A. § 47–18–111. However, securities transactions are a wholly different animal from insurance transactions, and special and additional considerations apply. Had the State focused its attention on these special and additional considerations, I believe a different result should have and would have been reached.

tivity. The plaintiff must, of course, allege each of these elements to state a claim.

*Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346, 358–9 (1985).

The RICO statute does not fully define the phrase "pattern of racketeering activity." It states merely that "a pattern of racketeering activity requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5). The statute defines "racketeering activity" as, *inter alia,* "any act which is indictable under any of the following provisions of Title 18, United States Code: Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud) ... or any offense involving ... fraud in the sale of securities ..., punishable under any law of the U.S." 18 U.S.C. § 1961(1).

The United States Supreme Court has explained that even the commission of two criminal acts, without more, does not establish the "pattern of racketeering activity" which a plaintiff must plead and prove in order to recover under civil RICO:

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in Section 1961 in that it states a pattern "requires at least two acts of racketeering activity," Section 1961(5), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern."

*Sedima,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) (quoting Sen.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)). In the words of the Court, a pattern requires "continuity plus relationship." *Id.*

"Since *Sedima,* attempts to define what constitutes a RICO pattern have become, as one Court has characterized it, a 'cottage industry.' " *Winer v. Patterson,* 663 F.Supp. 723, 725 (D.N.H.1987), citing *Mor-*

*ris v. Gilbert,* 649 F.Supp. 1491, 1502 (E.D. N.Y.1986). Three separate trends have evolved in the Circuits, but the issue is the same: whether a single scheme or episode can satisfy the "continuity plus relationship" test so as to produce a pattern of racketeering activity under RICO. The Sixth Circuit has not addressed the issue.

Four Circuits have taken an expansive view of the pattern requirement, finding that any two related acts of racketeering activity can constitute a pattern, even if the acts are committed in furtherance of a single criminal scheme. *See Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986); *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1355 (5th Cir.1985); *United States v. Ianniello,* 808 F.2d 184, 192 (2d Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 3229, 3230, 96 L.Ed.2d 736 (1987); *Cal. Arch. Building Production v. Franciscan Ceramics,* 818 F.2d 1466 (9th Cir.1987). "This approach has been critized as ignoring the Supreme Court's language in *Sedima* to the effect that it is Congress' intent that RICO should reach only continuous criminal activity." *Winer,* 663 F.Supp. at 723 (citing for example, *Roberts v. Smith Barney, Harris Upham & Co., Inc.,* 653 F.Supp. 406, 410–11 (D.Mass.1986)).

At the other end of the spectrum are the Fourth and Eighth Circuits which have held that illegal acts pertaining to a single criminal episode do not constitute a "pattern of racketeering activity." *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 152 (4th Cir.1987); *Superior Oil Co. v. Fulmer,* 785 F.2d 252, 257, n. 7 (8th Cir.1986) (cited with approval in *Madden v. Gluck,* 815 F.2d 1163 (8th Cir.1987)). This approach has also been critized, in that "defendants who commit a large and ongoing scheme, albeit a single scheme, would automatically escape RICO liability for their acts, an untenable result." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986).[12]

---

**12.** The concensus among Courts within the Sixth Circuit seems to be that more than one such scheme is necessary to meet the RICO pattern requirement. *See e.g., Cincinnati Gas & Electric Co. v. General Electric Co.,* 656 F.Supp.

49 (S.D.Ohio 1986) ("although all courts are not in agreement on this issue, until this question is resolved by the courts or Congress we ... find that more than one transaction or ... episode is required to constitute a pattern of racketeering

Three Circuits have taken a middle course between holding that any two acts may constitute a pattern and holding that a pattern requires acts in furtherance of multiple schemes. *Roeder v. Alpha Industries*, 814 F.2d 22 (1st Cir.1987); *Torwest DBC, Inc. v. Dick*, 810 F.2d 925, 928–29 (10th Cir.1987), *cited with approval in Condict v. Condict*, 815 F.2d 579, 583–85 (10th Cir.1987); *Morgan v. Bank of Waukegan*, 804 F.2d at 975–76, construed in *Marks v. Pannell Kerr Forster*, 811 F.2d 1108, 1110–12 (7th Cir.1987). As stated by the First Circuit in *Roeder*,

> We decline to adopt a definition of pattern that relies solely on whether activity can be classified as a single scheme or episode. Shifting the focus to such terms merely substitutes one set of definitional problems for another. Furthermore, given the indeterminate nature of this statutory language, and the subtleties inherent in looking for "continuity plus relationship," no one characteristic can be considered as controlling in determining whether a pattern exists. Cf. *Morgan v. Bank of Waukegan*, 804 F.2d at 975 (identifying several factors relevant to determining whether a pattern exists). In attempting to identify the order of magnitude at which acts constitute a pattern, the courts recognize that acts can be so closely interrelated in function and connected in time that the "threat of [a] continuing activity" factor is absent. *See e.g., Marks v. Forster*, 811 F.2d 1108 (7th Cir.1987).

*Roeder*, 814 F.2d at 31.

Given the fact that the Sixth Circuit has yet to address the issue, and that the Circuits are in disagreement, the undersigned determines that, rather than adopting the reasoning of any one of the three divisions among the Circuits, the best course is to reason from those Circuit decisions most

apposite to the case at bar. The undersigned finds *Zepkin* and *Roeder* most apposite.

In *Zepkin*, the Fourth Circuit concluded that a RICO complaint by investors alleging as predicate acts two violations of the securities laws in connection with the sale of securities did not sufficiently allege a pattern of RICO activity. The Court held that the conduct charged was instead merely that of a "single, limited scheme" to defraud. Though it met the technical requirements of a sufficient number of predicate acts sufficiently related to each other, it failed to charge the kind and degree of continuous engagement in criminal conduct required to constitute a RICO "pattern."

Significant to the case at bar, the plaintiffs in *Zepkin* alleged that the defendants committed securities fraud through the use of a fraudulent prospectus that was sent to numerous investors. The Court held that no pattern could be established from these allegations:

> We believe that a single, limited fraudulent scheme, such as the misleading prospectus in this case, is not of itself sufficient to satisfy Section 1961(5). Nor do we find "a pattern" in the fact that one allegedly misleading prospectus reached the hands of ten investors. If the commission of two or more "acts" to perpetrate a single fraud were held to satisfy the RICO statute, then every fraud would constitute "a pattern of racketeering activity." It will be the unusual fraud that does not enlist the mails and wires in its service at least twice. Such an interpretation would thus eliminate the pattern requirement altogether.

*Zepkin*, 812 F.2d at 145–155.

As further stated by the Fourth Circuit, "the number of predicate acts is not an appropriate litmus test" to determine the

---

activity." *Id.,* at 79); *McIntyre's Mini Computer v. Creative Synergy Corp.,* 644 F.Supp. 580 (E.D. Mich.1986) (separate acts in furtherance of the same criminal episode or transaction do not constitute a "pattern" of racketeering activity under RICO); *Zahra v. Charles,* 639 F.Supp. 1405 (E.D.Mich.1986) (separate acts in furtherance of the same criminal episode or transaction do not constitute a "pattern" of racketeer-

ing activity); *In re Evening News Association Tender Offer Litigation,* 642 F.Supp. 860 (E.D. Mich.1986) (a "pattern of racketeering activity" requires more than a single episode ... even if the episode consists of more than one indictable act); *Millers Cove Energy Co. v. Domestic Energy Service Co.,* 646 F.Supp. 520 (E.D.Mich.1986) (RICO requires more than a single episode of racketeering activity).

existence of a RICO pattern. *Zepkin*, 812 F.2d at 155. "The pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." RICO is not " 'aimed at the isolated offender.' " *Id.*, at 155.

The Court held that the allegedly fraudulent sale of securities constituted a "single, limited scheme" even though it involved numerous investors. The Court held,

> To allow a "pattern of racketeering" to flow from a single, limited scheme such as this one would undermine Congress' intent that RICO serve as a weapon against ongoing unlawful activities whose scope and persistence pose a special threat to social well being. The present case does not involve a "pattern of racketeering," but ordinary claims of fraud best left to "the state common law of frauds" and to "well established federal remedial provisions."

*Zepkin*, 812 F.2d at 155.

*Zepkin*, of course, is a product of the Fourth Circuit's narrow interpretation that illegal acts pertaining to a single criminal episode do not constitute a "pattern of racketeering activity." It stands, nevertheless, as the most factually apposite Circuit decision to the case at bar. Plaintiffs have not cited, nor has my research revealed, any Circuit decision on similar facts which has reached a contrary result. For this reason, *Zepkin* is highly persuasive.

*Roeder* is also persuasive. In *Roeder*, the First Circuit joined the Seventh and Tenth Circuits in taking the middle position between holding that any two acts may constitute a pattern, and holding that a pattern requires acts in furtherance of multiple schemes. *Roeder* involved allegations of securities, wire and mail fraud in furtherance of one bribery scheme, which was held not to establish a RICO pattern. Although factually dissimilar, the Court reiterated the position that a threat of continuing criminal activity on the part of the defendant is required to satisfy the "pattern of racketeering activity" requirement. The Court held:

All of the racketeering acts *Roeder* alleges relate to a single instance of bribery. There is no suggestion that defendants used similar means to obtain other subcontracts, or that they bribed anyone else. RICO is 'not aimed at the isolated offender.' *Sedima, S.P.R.L. v. Imrex Co.*, 105 S.Ct. at 3285, n. 14 (quoting 116 Cong.Rec. 35193 (1970) (statement of Rep.Poff)). We hold that the bribery of Adamsky did not constitute "a pattern of racketeering activity."

*Roeder*, 814 F.2d at 31.

In a non-securities case, the Tenth Circuit (a middle ground Circuit) has articulated what the undersigned believes to be perhaps the best discourse on the continuity requirement. In *Torwest DBC, Inc. v. Dick*, 810 F.2d 925 (10th Cir.1987), the Court held:

> The continuity requirement has been the source of considerable difficulty. Courts generally agree that to make an adequate showing of continuity under *Sedima*, a plaintiff must demonstrate some facts from which at least a threat of ongoing illegal conduct can be inferred. A scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is accomplished.

*Id.*, at 928–929.

Applying *Zepkin*, *Roeder* and *Torwest* to the facts of this case, it must be concluded that defendants have not engaged in a pattern of racketeering activity inasmuch as they have failed to meet the continuity requirement of RICO. Like the plaintiffs in *Zepkin*, plaintiffs here allege a single scheme to defraud based upon the publication of an allegedly fraudulent prospectus. The fact that the prospectus was published to numerous investors is of no consequence. Plaintiffs have alleged that defendants set out to achieve a single discrete objective, namely, to defraud plaintiffs in the sale and purchase of interests in the Sandestin Beach Hilton Hotel. Under the holdings of *Zepkin*, *Roeder* and *Torwest*, such poses no threat of continued criminal

conduct, and therefore, fails to state a claim under RICO.

This conclusion is consistent with the most recent holdings of the District Courts which have considered this issue. *See Winer v. Patterson,* 663 F.Supp. 723 (D.N.H.1987); *One–0–One Enterprises, Inc. v. Caruso,* 668 F.Supp. 693 (D.D.C.1987); *Roberts v. Smith Barney, Harris, Upham & Co., Inc.,* 653 F.Supp. 406 (D.Mass.1986); *Anisfeld v. Cantor Fitzgerald & Co., Inc.,* 631 F.Supp. 1461 (S.D.N.Y.1986).

In *Anisfeld,* the Court examined and rejected a RICO claim based on facts similar to the instant case. In *Anisfeld,* 16 plaintiffs claimed that they were induced to purchase $1,350,000 in limited partnership interests based upon false and misleading statements contained in a confidential investment memorandum. The limited partnership was established to acquire and operate a 490 unit apartment complex. The Court, nevertheless, dismissed the RICO claim on the following grounds:

> The complaint in this case arises out of a single transaction. The fact that there may have been numerous misrepresentations in connection with a single transaction would not create a pattern under the interpretation of the RICO statute. A single fraudulent transaction does not constitute a pattern; there must be multiple events to satisfy the continuity inherent in the term "pattern."

*Id.,* at 1467.

Certainly plaintiffs have cited, and the undersigned recognizes that, at the District Court level, some authority exists to the contrary. The undersigned concludes, however, that *Zepkin* and its progeny is the most persuasive interpretation of *Sedima,* at least with respect to the facts of this case.

The undersigned respectfully recommends that plaintiffs' RICO claims found in Count II of the Comprehensive Amended Complaint be dismissed.[13]

---

13. It is noted that a RICO claim was not alleged in the companion case, *McInnis v. Merrill*

## VII.

### Respondeat Superior—Michael Williams

Plaintiffs allege in Count VI of the Comprehensive Amended Complaint that defendants are liable to plaintiffs for the acts of Michael Williams under the doctrine of *respondeat superior.* Defendants argue that plaintiffs have failed to state a claim upon which relief can be granted.

At oral argument, counsel for plaintiffs and defendants agreed that this claim should be dismissed, inasmuch as it is premised on the actions of Michael Williams, who has been dismissed as a defendant to this litigation. Respecting this decision of counsel, the undersigned recommends that plaintiffs' allegations concerning Michael Williams in Count VI of the Complaint be dismissed.

## VIII.

### Respondeat Superior—SBH–Sandcastle

Plaintiffs allege that Merrill Lynch is liable for the alleged unlawful acts of SBH and Sandcastle pursuant to the doctrine of *respondeat superior.* Merrill Lynch argues that this claim should be dismissed because plaintiffs have not alleged that Merrill Lynch was the employer of either SBH or Sandcastle, or that SBH and Sandcastle were acting within the course and scope of their alleged employment by Merrill Lynch.

The Sixth Circuit has recognized that parties may be vicariously liable for the acts of their agents committed in violations of the securities laws. *See Davis v. AVCO Financial Services, Inc.,* 739 F.2d 1057, 1062 (6th Cir.1984); *Holloway v. Howerdd,* 536 F.2d 690 (6th Cir.1976); *Armstrong Jones & Co. v. SEC,* 421 F.2d 359 (6th Cir.) *cert. denied,* 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970). In a suit alleging liability for the act of an agent it is sufficient simply to assert the existence of an agency relationship without setting forth the contract of agency or details about the relationship in the pleadings, inasmuch as the

*Lynch,* 706 F.Supp. 1355.

terms of the agency are evidentiary in nature. *Templeton v. Atchison, T & SF Railway Co.*, 7 F.R.D. 116 (D.C.Mo.1946).

Paragraph 3.2(4) of the Comprehensive Amended Complaint recites:

> Pursuant to the doctrine of *respondeat superior*, Merrill Lynch is liable for the unlawful acts of its agents, representatives, and affiliates, including, but not limited to, the unlawful acts of SBH, Sandcastle, and any representatives or agents of Merrill Lynch who participated in the preparation of the PPM or in the making of sales presentations to any of the plaintiffs.

The undersigned is of the opinion that paragraph 3.2(4) of the complaint sufficiently apprises defendant of the nature of the claim asserted, and comports with the "notice pleading" provided by the Federal Rules of Civil Procedure, recognized in *Templeton*. Whether SBH and Sandcastle are agents of Merrill Lynch, and whether they were acting within the scope of their employment are questions of fact, and not properly to be considered in a 12(b)(6) motion to dismiss.

I therefore recommend that this aspect of the motion of Merrill Lynch be denied.

### IX.

### Claims Against Defendant for Actions of Others

Plaintiffs allege in paragraph 3.2 of the complaint that "Merrill Lynch is liable to the plaintiffs for all of the unlawful acts set forth in this complaint unless otherwise specified." Defendant argues that plaintiffs' claims for relief based upon the actions of others and the actual construction of the hotel and townhouses should be dismissed as to Merrill Lynch, as Merrill Lynch did not participate in the actual construction of either the hotel or townhouses.

This is a curious argument. Without doubt, whether Merrill Lynch can be held liable depends on whether its own activities are sufficient to render it liable under the securities laws. Questions whether Merrill Lynch possessed the necessary scienter, acted negligently, or otherwise fulfilled the elements of a securities fraud action are questions of fact to be resolved after the completion of discovery. Whether Merrill Lynch had any involvement in actually constructing the townhouses is not determinative of its liability under the securities laws. Certainly, defendant could have known of the project sufficient to meet any scienter requirement without being involved in the actual construction. In any event, defendant's involvement in that activity, if any, is a question of fact inappropriate for consideration in a motion to dismiss.

I therefore recommend that this portion of the motion of defendant Merrill Lynch be denied.

### RECOMMENDATION

Based on the foregoing analysis, the undersigned respectfully recommends that the motion of defendant Merrill Lynch be granted in part and denied in part.

It is recommended that the following claims be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure:

1) plaintiffs' claims under Section 17(a) of the Securities Act of 1933;

2) plaintiffs' claims under the Tennessee Consumer Protection Act;

3) plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act; and

4) plaintiffs' claims of *respondeat superior* liablity based on the conduct of Michael Williams.

It is recommended that all other claims remain pending in this lawsuit.

### MOTION OF DEFENDANT MORTON OLSHAN TO DISMISS

### I.

For the reasons previously discussed in the motion of Merrill Lynch to dismiss, the undersigned recommends that the motion of defendant Morton Olshan to dismiss be granted as it pertains to plaintiffs' claims under Section 17(a) of the Securities Act of

1933, RICO, and the Tennessee Consumer Protection Act.

## II.

### Pleading Fraud With Particularity

As with the other defendants, the majority of the claims asserted against Morton Olshan are premised upon fraud. Defendant argues the complaint fails to plead fraud with Rule 9(b) particularity for primary violations of Section 10(b) and Rule 10b–5, state common law fraud, "controlling person" liability, and aiding and abetting.

Again, Rule 9(b) requires that circumstances constituting fraud be stated with particularity. It requires allegations as to the "time, place and content" of any alleged misrepresentations and omissions. *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984). These allegations must be made specifically with regard to each individual defendant. *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978).

### A.  Rule 10b–5

Plaintiffs seek to hold Morton Olshan individually liable for primary violations of Rule 10b–5. The elements of a Rule 10b–5 claim are:

> 1) a false representation or omission of a material fact; 2) made with scienter; 3) upon which the plaintiff reasonably relied; and 4) which proximately caused damage to the plaintiff(s).

*Lucas v. Florida Power & Light Co.*, 765 F.2d 1039 (11th Cir.1985).

The allegations in the complaint concerning misrepresentations and omissions take three forms: 1) allegations that omissions and misrepresentations are contained in the PPM; 2) allegations that certain unnamed "defendants" or their "representatives" made oral representations at sales presentations; and 3) in a few passages, none of which pertain to Olshan, plaintiffs allege that particular individuals made particular oral mispresentations.

The complaint satisfies Rule 9(b) with regard to the Rule 10b–5 claim asserted against Morton Olshan. The primary focus of the complaint is that omissions and mis-

representations were made in the PPM. Plaintiffs' reference to the PPM satisfies Rule 9(b)'s requirements as to identification of the time, place and content of the alleged misrepresentations. *Luce v. Edelstein*, 802 F.2d at 55. And, no specific connection between fraudulent misrepresentation in the PPM and a particular defendant is necessary where, as here, the defendant is a director participating in the offer of the securities in question. *Id.; Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 911 (S.D.N.Y.1983). Accordingly, the claims grounded in the PPM are sufficiently pleaded to pass muster under Rule 9(b).

And, for the reasons discussed in the motion of Merrill Lynch, plaintiffs' assertion that certain "defendants" made oral misrepresentations at sales presentations also satisfies the requiremets of Rule 9(b). Olshan is a director of SBH, which is alleged to have participated in the sales presentations. Accordingly, for the reasons previously discussed, plaintiffs have satisfied the minimal requirements of Rule 9(b) with respect to these claims.

I therefore recommend that the motion of defendant Morton Olshan to dismiss with respect to the Rule 10b–5 claims and Rule 9(b) particularity be denied.

### B.  Common Law Fraud

Plaintiffs allege that Olshan is liable for State common law fraud. Defendant moves to dismiss this allegation for plaintiffs' failure to plead fraud with particularity.

The elements of a cause of action for fraud in Tennessee are:

> 1) There must be a representation of an existing or past fact and not an opinion or a conjecture as to future events; 2) the representation must be false; 3) the representation must be in regard to a material fact; 4) there must be proof of fraud; 5) the plaintiff must rely reasonably on the misrepresented material fact; and 6) the plaintiff must suffer damage.

*Edwards v. Travelers Insurance of Hartford, Connecticut*, 563 F.2d 105 (6th Cir. 1977).

For the reasons discussed in the previous section, I find that plaintiffs have adequately stated a claim for fraud with respect to the claims grounded in both the PPM and sales presentations. I therefore recommend that this aspect of defendant Morton Olshan's motion be denied.

### C. Controlling Person Liability

In addition to Olshan's alleged "direct participation" in securities fraud, plaintiffs allege that he is liable as a "controlling person," stating: "he possessed, directly or indirectly, the power to cause or cause the direction of the management and policies of SBH and its affiliates, and, having such a power, was and is a controlling person subject to liability under the relevant state and federal securities laws...." Complaint at ¶ 3.10(2).[14]

The Sixth Circuit has held:

A director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed.

*Herm v. Stafford,* 663 F.2d 669 (6th Cir. 1981).

Defendant asserts dismissal is appropriate as plaintiffs have failed to allege that Olshan either participated in or exerted some influence in the corporation's operation. While it is true that the complaint fails to track the exact language of *Herm,* it nevertheless avers facts sufficient to raise a genuine issue for trial as to whether Olshan was and is a "controlling person." In reaching this conclusion, I am mindful of the language in Rule 8(f) of the Federal Rules of Civil Procedure which states: "All pleadings shall be so construed as to do substantial justice."

The complaint alleges that Olshan is not only a director of SBH, but that he is also an officer and shareholder of SBH. Complaint at ¶ 3.10. As the PPM, which is part of the complaint makes clear, he is one of only four persons who are officers, directors or shareholders of SBH. *See* PPM Legal Document at 9–10. In the sales brochure, part of the PPM, Olshan's background is described in detail under the pages headed "Management." Further, the complaint, at Paragraph 3.10, alleges that he is the controlling shareholder of SBH, and that he provided the initial infusion of funds necessary to make the securities offering possible.

The assertions in the complaint and its exhibits make clear that SBH is not a large, public-held corporation with passive directors who are not involved in the company's operations. Rather, the complaint makes clear that SBH is a four-man operation. Certainly, a question of fact exists as to whether, under these allegations set forth in the complaint, Olshan is a "controlling person" within the meaning of the securities laws. *See SEC v. Coffey,* 493 F.2d 1304, 1318 (6th Cir.1974) (whether a person "controls" another under Section 20(a) is a complex factual question.)

I recommend that this aspect of defendant Olshan's motion to dismiss be denied.

### D. Aider and Abettor Liability

Plaintiffs allege in paragraph 3.10 of the complaint that defendant Olshan is liable for aiding and abetting the commission of

---

**14.** Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Congress modeled Section 20(a) upon Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o which reads:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more persons by or through stock ownership, agency, or otherwise, controls any person liable under §§ 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

unlawful acts. Defendant moves to dismiss this claim on the grounds that plaintiffs have not alleged facts to support each of the elements of the claim for aiding and abetting.

The three elements to a claim of aiding and abetting are:

> 1) a primary violation by another party; 2) a "general awareness" by the aider and abettor "that his role was part of an overall activity that is improper;" and 3) that the aider and abetter "knowingly and substantially assisted in the violation."

*Herm v. Stafford,* 663 F.2d at 684; *SEC v. Coffey,* 493 F.2d at 1315–18; *Goldberg v. Meridor,* 81 F.R.D. 105, 111, n. 10 (S.D.N. Y.1979). Under *Herm,* whether a defendant may be held liable as an aider and abettor is a factual question inappropriate for resolution prior to trial. *See also Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975); *Tucker v. Janota,* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH), para. 96, 701, at 94, 716 (N.D.Ill. 1978) [1978 WL 1128].

The complaint adequately states a claim for aiding and abetting. Plaintiffs have adequately pleaded primary violations by other parties. They allege that Olshan knew sufficient facts to warrant holding him liable for aiding and abetting, and have provided enough facts for the Court to infer that such indeed was possible. Finally, plaintiffs have adequately alleged that Olshan substantially assisted the violation in that he allegedly provided the initial infusion of funds necessary to make the securities offering possible, and was a "controlling person" in the operation of the project.

I recommend that this aspect of defendant Olshan's motion to dismiss be denied.

## III.

### Seller Under Section 12(2)

Plaintiffs allege that defendant Olshan is liable as a seller under Section 12(2) of the Securities Act of 1933.[15] Defendant argues that the complaint fails to allege sufficiently that Olshan is a seller.

In order to be liable under Section 12, one must be a "seller" of securities. *Davis v. AVCO Financial Services, Inc., supra; Croy v. Campbell,* 624 F.2d 709, 712 (5th Cir.1980). *AVCO* holds that a person may be considered a "seller" under Section 12(2) if his actions were both a cause in fact, and a substantial factor, in the sales transaction. *Id.,* at 1067.

The complaint sufficiently alleges that defendant Olshan is a seller. Plaintiffs have alleged that Olshan was a controlling principal of SBH, and that he provided the initial funds or credit that made it possible for SBH to proceed with the offering. The complaint has sufficiently alleged that "but for" Olshan's activities the offering would not have taken place. Further, the allegations concerning the provision of funds and the ability to control through the status of officer, director and majority shareholder is sufficient to raise a question as to whether Olshan's activities were a substantial factor in causing SBH to engage in the offering.

I respectfully recommend that this aspect of defendant Olshan's motion to dismiss be denied.

## IV.

### Breach of Contract and Warranty

Count V of the complaint asserts claims for breach of contract and breach of warranty arising out of the plaintiffs' unit sale agreements. Defendant argues Count V

---

**15.** Section 12(2) provides, in pertinent part:
Any person who—(2) offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him ...
15 U.S.C. § 77*l* (1982).

fails to state a claim against Olshan, and plaintiffs agree.

Although plaintiffs have advised via brief that they do not purport to assert a cause of action against Olshan in Count V of the complaint, the language of the complaint is unclear. Therefore, for clarification of the record, the undersigned recommends that the Court enter an order dismissing Olshan from Count V of the complaint.

## V.

### Fiduciary Duty

The complaint alleges in paragraph 5.25 that SBH, Sandcastle and their principals, breached the fiduciary duties owed to the plaintiffs by erecting the townhouse structure between the hotel and the Gulf of Mexico in a manner that obstructs the view and damages the hotel's value by impairing its marketability and desirability as a resort accommodation. Olshan asserts that the breach of fiduciary duty claims fail to state a claim as to him.

Whether a fiduciary duty exists between plaintiffs and Olshan is a question of Tennessee law. Neither party has briefed this issue with regard to Tennessee law. The undersigned therefore recommends that the Court reserve ruling on this aspect of defendant's motion until such time as the parties have had the opportunity to argue the motion with appropriate Tennessee citations.

### RECOMMENDATION

Based on the foregoing analysis, the undersigned respectfully recommends that the motions of defendant Morton Olshan be granted in part and denied in part.

It is recommended that the following claims be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure:

1) plaintiffs' claims under Section 17(a) of the Securities Act of 1933;

2) plaintiffs' claims under the Tennessee Consumer Protection Act;

3) plaintiffs' claims under the Federal Racketeer Influenced and Corrupt Organizations Act; and

4) plaintiffs' claims for breach of contract and breach of warranty.

It is further recommended that all other claims remain pending in this lawsuit, and that the parties submit additional briefs on the issue of whether a fiduciary duty exists with respect to defendant Morton Olshan under Tennessee law.

## MOTION OF DEFENDANT LAVENTHOL & HORWATH TO DISMISS

### I.

For the reasons previously discussed in the motion of defendant Merrill Lynch to dismiss, the undersigned recommends that the motion of defendant Laventhol & Horwath ["Laventhol"] to dismiss be granted as it pertains to plaintiffs' claims under Section 17(a) of the Securities Act of 1933, RICO, and the Tennessee Consumer Protection Act.

### II.

As with the other defendants, the majority of the claims asserted against Laventhol & Horwath are premised upon fraud. Defendant argues the complaint fails to plead fraud with Rule 9(b) particularity for the claim of primary liability under Section 10(b) and Rule 10b–5, "controlling" person liability, aiding and abetting liability, and common law fraud.

Plaintiffs allege that the PPM contains misrepresentations as to the expected inflation rates for the years 1983–1985, which affected Laventhol & Horwath's rental income projections and feasibility report.[16]

---

**16.** The complaint states, at paragraph 4.23: Among other things, the Laventhol & Horwath rental income projections and feasibility report were based upon assumed inflation rates of 12 percent for 1983, 10 percent for 1984 and 9 percent annually thereafter through 1989. The actual rate of inflation in the consumer price index for 1983 was 3.2 percent, for 1984 was 4.3 percent and for 1985 was 3.6 percent. The actual rate of inflation in the consumer price index for 1982 was 6.1 percent. As of the date of the PPM, the defendants knew, or should have known, that it was wholly unreasonable and reckless to

However, the PPM makes it quite clear that Laventhol's projections of potential rental income were speculative in nature. Directly under the computation for projected occupancies and average room rates, at page I–3 of the PPM, appears the following disclaimer:

> The projected inflated average room rates could be materially different if significantly higher or lower rates of inflation are actually experienced. Since the actual rates of inflation cannot be predicted with any degree of certainty, no assurance is given that the projected average room rates will not vary materially from those shown above.

Further, in the letter which appears directly before the Laventhol report, is the following language:

> The report and accompanying summary are based on estimates, assumptions and other information developed from research of the market, knowledge of the industry and information provided by you and your representatives ... Since the projections are based on estimates and assumptions, which are inherently subject to uncertainty and variation depending upon evolving events, we do not represent them as results that will actually be achieved.

PPM at I–1.

Plaintiffs' claims based on the inflation rates in the PPM do not state a claim for relief under Section 10(b). As evidenced above, the statements clearly caution investors of the speculative nature of the financial projections. When projections in the PPM clearly "bespeak caution," as here,

plaintiffs have failed to state a claim under Section 10(b). *Luce v. Edelstein*, 802 F.2d at 56; [17] *Polin v. Conductron Corp.*, 552 F.2d 797, 806, n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977) (quoted approvingly in *Goldman v. Belden*, 754 F.2d 1059, 1068 (2d Cir.1985)).

The thrust of the complaint against Laventhol relates to the alleged misrepresented inflation rates. At paragraph 4.24 of the complaint, however, plaintiffs assert a few other deficiencies in the Laventhol report.[18] These claims are again either premised on future forecasts, which Laventhol has disclaimed, or are based on negligence. Should plaintiffs contend that the remaining claims are not based on negligence, the undersigned points out that, with respect to these claims, plaintiffs have failed to allege scienter, a necessary element for Section 10(b) and Rule 10b–5 liability. *See Lucas v. Florida Power & Light Co.*, 765 F.2d 1039 (11th Cir.1985).

In addition to Laventhol's alleged "direct participation" in securities fraud, plaintiffs allege Laventhol is liable as a "controlling person." Laventhol argues plaintiffs have failed properly to allege a claim for controlling person liability. The undersigned agrees.

The securities laws impose secondary liability on those persons who, directly or indirectly, control any person liable under any provision of the securities laws. 15 U.S.C. § 78t(a); 15 U.S.C. § 77*o*; T.C.A. § 48–2–122(g); *Herm v. Stafford*, 663 F.2d at 669. Again, the Sixth Circuit has held that before controlling person liability may

---

project rental income from the hotel based upon the assumption that inflation rates would be as projected in the PPM.

**17.** *Luce* held that allegations that the offering memoranda in that litigation contained intentional misrepresentations as to potential cash and tax benefits did not state a claim under Section 10(b) where the memoranda made it quite clear that its projections of potential cash and tax benefits were necessarily speculative and that no assurance could be given that the projections would be realized. *Luce,* 802 F.2d at 56.

**18.** Paragraph 4.24 of the complaint provides:

In addition, the room rates, expenses, gross and net income, other financial aspects, and growth rates contained in the financial projections were unrealistic in view of the actual peak season for the area, the region's average yearly rates, and other factors. The PPM also failed to adequately disclose that rental rates of similar size rooms would vary and that relatively small variances in room rates for hotel occupancy could materially alter the financial results for the hotel. The PPM did not adequately inform investors of the amount of variance in room rates or occupancy necessary to cause a material deviation from the financial projections as set forth in the PPM.

be imposed, "there must be some showing of actual participation in the corporation's operation or some influence (exerted)." *Herm*, 663 F.2d at 684.

Here, plaintiffs have wholly failed to plead facts sufficient to allege that Laventhol participated in or exerted even an indirect influence in the operations of SBH, Merrill Lynch, or anyone else. Indeed, plaintiffs have alleged only that Laventhol was "retained by SBH to prepare financial projections and a market study and financial projections to determine the feasibility of constructing the hotel and financing the hotel through the sale of hotel interests." Paragraph 3.6 of the Complaint. Such an allegation simply does not even remotely suggest participation in or influence in the operations of SBH, Merrill Lynch, or anyone else potentially liable under the securities laws.

Finally, plaintiffs allege in paragraph 3.6 of the complaint that defendant Laventhol is liable for aiding and abetting the commission of unlawful acts. Defendant argues that plaintiffs have not alleged facts to support each of the elements of a claim for aiding and abetting. The undersigned agrees.

Again, the three elements to a claim of aiding and abetting are:

1) a primary violation by another party;
2) a general awareness by the aider and abettor that his role was part of an overall activity that is improper; and 3) that the aider and abettor knowingly and substantially assisted the violation.

*Herm v. Stafford*, 663 F.2d at 684.

Plaintiffs have failed properly to allege a claim for aiding and abetting. Plaintiffs have not alleged any facts supporting the assertion that Laventhol had knowledge that its role was part of an overall improper activity. Mere retention for accounting services is simply not enough to impute knowledge of alleged fraudulent conduct on the part of others. Without some underlying factual basis for believing that Laventhol had a general awareness of the alleged fraudulent activities, plaintiffs' assertions are conclusory, and fail to meet the strictures of Rule 9(b). *See generally*

*Luce v. Edelstein*, 802 F.2d at 54; *The Limited, Inc. v. McCrory Corporation*, 683 F.Supp. 387 (S.D.N.Y.1988) (available on WESTLAW). *The Limited* is a case which is instructive to this case on several points. However, with respect to the claim now under review, the Court held that, "although scienter may be alleged in conclusory terms, Rule 9(b) requires that general averments of scienter be accompanied by detailed factual allegations capable of supporting an inference of fraud."

Having concluded that plaintiffs have failed to plead fraud with the particularity required by Rule 9(b), the Court must next determine whether these claims should be dismissed, or whether plaintiffs should be given the opportunity to remedy the pleading deficiencies. This question was recently addressed by the Sixth Circuit in *Michaels Building Co. v. Ameritrust Co., N.A.*, 848 F.2d 674 (6th Cir.1988).

In *Michaels*, the Sixth Circuit reversed the District Court for the Northern District of Ohio for being "too exacting" in dismissing a complaint for lack of specificity. Admittedly, the facts of *Michaels* are different from those at bar. In *Michaels*, the only fact that plaintiffs omitted from their complaint was the identification of borrowers receiving sub-prime loans. Nevertheless, the opinion contains dictum of potentially far-reaching implication.

The Rule 9(b) analysis in *Michaels* begins with the admonition that dismissal is inappropriate "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The Court then lends its support to the view that where there has been no discovery, and where the facts underlying the claims are within the defendant's control, dismissal is inappropriate. The Court admonishes, however, that there must be a "reasonable basis" for plaintiff's complaint, and defendant must be put on notice of the "nature of the claim." *Michaels*, at 680.

Clearly, *Michaels* eschews a draconian application of Rule 9(b). Indeed, the Court states that it does not believe that the

Rulemakers intended the harsh result of the particularity requirement preventing courts from "reaching the truth in the cases before them." *Michaels*, at 680.

Here, the Court is faced with a dilemma. On the one hand, the complaint under review is the fifth amended complaint of plaintiffs. On the other hand, plaintiffs have never been advised by the Court of the specific pleading deficiencies contained in the complaint, and it is likely that many of the factual details omitted from the pleadings are in the hands of defendant(s). Discovery has been stayed, and a reasonable basis exists for inferring that defendant Laventhol could have been a party to the fraud alleged in the complaint. In any event, it is not *"beyond doubt* that plaintiff[s] can prove no set of facts in support of the claim which would entitle [them] to relief." *See Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–102 (emphasis added). Defendant is, without doubt, apprised of the nature of the claim.

Under these circumstances, I conclude that dismissal should be reserved until such time that plaintiffs have had an opportunity to conduct discovery for 90 days and to file an amended complaint shortly thereafter. This is a longer time period than that espoused in *Michaels*. Due to the nature of the pleading deficiencies here, however, I believe such additional time is necessary for the parties to produce and review any relevant documents which could remedy the aforementioned pleading deficiencies.

As stated in *Michaels*, "if plaintiffs' claims are groundless, that conclusion will emerge as discovery proceeds." *Michaels*, at 680. Further, if, after the commencement of discovery, "plaintiffs are still unable to plead a sufficient factual basis for the allegations made against defendant(s), the spectre of Rule 11 sanctions should guide the actions of plaintiffs' counsel." *Id.*, at 681.

I therefore recommend that defendant's motion to dismiss plaintiffs' securities claims for failure to plead fraud with Rule 9(b) particularity be reserved pending 90 days of discovery and the filing of an amended complaint.

### III.

Having concluded that plaintiffs' RICO claims should be dismissed, and that the Court should reserve ruling on the motion to dismiss the securities claims, the motion to dismiss the remaining pendent state law claims is not considered at this time. Should the Court later dismiss the securities claims for failure to plead fraud with particularity, the Court could also, in its discretion, dismiss any remaining pendent claims at that time. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I therefore decline to expend judicial resources on state law issues that may, at a later date, be dismissed as a matter of course.

### RECOMMENDATION

Based on the foregoing analysis, I recommend that plaintiffs' claims under RICO, Section 17(a) of the Securities Act of 1933, and the Tennessee Consumer Protection Act be dismissed. I further recommend that a ruling on defendant's motion to dismiss be in all other respects reserved, pending 90 days of discovery and the filing of an amended complaint.

### MOTION OF DOMINION FEDERAL SAVINGS & LOAN ASSOCIATION TO DISMISS

### I.

For the reasons previously discussed in the motion of defendnat Merrill Lynch to dismiss, I recommend that plaintiffs' claims under Section 17(a) of the Securities Act of 1933, the Tennessee Consumer Protection Act, and the Federal Racketeer Influenced and Corrupt Organizations Act be dismissed.

### II.

Plaintiffs allege in paragraph 3.5 of the complaint that defendant Dominion Federal is 1) primarily liable under Section 10(b)

and Rule 15b–5;[19] 2) as a controlling person; and 3) for aiding and abetting. Defendant Dominion Federal adopts the arguments set forth in the brief of Merrill Lynch, and moves to dismiss these claims for failure to plead fraud with Rule 9 particularity.

As alleged in the complaint, defendant Dominion Federal ["Dominion"] played an extremely limited role in this securities offering. Dominion was the lending institution making loans available to plaintiffs who wished to purchase hotel interests. Plaintiffs urge the Court to view Dominion as a central figure in a three-way scheme (SBH–Merrill Lynch–Dominion) to defraud investors, in that an agreement was reached whereby Dominion would be the sole lending institution for plaintiffs seeking loans to finance their hotel interests. Plaintiffs have wholly failed to allege any facts to support a conclusion of fraud, however.

The complaint is void of any allegation that Dominion participated in the preparation of the PPM, that it distributed it, or was aware of its contents. There is further no allegation that Dominion participated in the actual sales of the securities, or attended sales presentations. Indeed, I have found no allegation of fraudulent conduct on the part of Dominion anywhere in the complaint.

As to the allegations of controlling person liability, the complaint is void of any facts to suggest that Dominion participated in, or exerted an influence in the operations of SBH, Merrill Lynch, or anyone else. A bank which provides routine lending services to a broker is simply not liable as a "controlling person" within the meaning of the securities laws. *Wright v. Schock*, 571 F.Supp. 642 (N.D.Calif.1983).

Nor have plaintiffs adequately pleaded facts to suggest that Dominion is liable as an aider and an abettor. Plaintiffs allege that Dominion "knew or should have known facts sufficient to provide [it] with notice of the securities law violations that were committed in connection with such sales...." Plaintiffs have failed to provide *any* facts in support of this assertion, however. An agreement to serve as the lending institution simply is insufficient to impute knowledge of others' wrongs. Without some underlying reason for this Court to believe Dominion knew or should have known of others' alleged wrongs, the claims are inadequately pleaded. *See Luce*, 802 F.2d at 54; *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972); *The Limited, Inc., supra.*

For the reasons enumerated in the motion of defendant Laventhol to dismiss, I recommend that defendant's motion to dismiss plaintiffs' securities claims for failure to plead fraud with Rule 9(b) particularity be reserved pending 90 days of discovery and the filing of an amended complaint.

### III.

Having concluded that plaintiffs' RICO claims should be dismissed, and that the Court should reserve ruling on the motion to dismiss the securities claims, the motion to dismiss the remaining pendent claims is not considered at this time. Should the Court later dismiss the securities claims for failure to plead fraud with particularity, the Court could also, in its discretion, dismiss any remaining pendent claims at that time. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). I therefore decline to expend judicial resources on state law issues that may, at a later date, be dismissed as a matter of course.

### RECOMMENDATION

Based on the foregoing analysis, I recommend that plaintiffs' claims under RICO, Section 17(a) of the Securities Act of 1933, and the Tennessee Consumer Protection Act be dismissed. I further recommend that a ruling on defendant's motion to dismiss be in all other respects reserved, pending 90 days of discovery and the filing of an amended complaint.

---

**19.** It is actually unclear whether plaintiffs intend to pursue this claim, as it was not discussed at oral argument. The undersigned will nevertheless consider the claim as it appears in paragraph 3.5(1) of the complaint.

**1352**

### PLAINTIFFS' MOTION TO DISMISS THE DEFENDANTS' COUNTERCLAIM

Defendants Flautt, Mann, William Alias and Fred Alias have filed a counter-complaint based upon the tort of interference with prospective business advantage. The act claimed to constitute the tort is the act of filing this lawsuit. It is alleged that the lawsuit is groundless, and that it operates to interfere tortiously with the business relationships of these individual defendants, specifically with their ability to sell condominium units to the East of the Sandestin Beach Hilton Hotel, and to develop 3.77 acres to the West of the Hotel. Plaintiffs argue that defendants have failed to state a claim upon which relief can be granted. The undersigned agrees.

Without doubt, this motion presents a novel question to this Court: Can defendants counterclaim for tortious interference with prospective business relationships for the filing of an allegedly groundless lawsuit, and survive a motion to dismiss? The question is properly broken down into three component questions. First, do Tennessee courts recognize the tort of interference with prospective business advantage? Second, if Tennessee courts recognize the tort, does the tort apply to groundless civil lawsuits? Third, if Tennessee courts recognize the tort, and apply it to groundless civil lawsuits, can defendants assert the tort as the basis of a counterclaim in the allegedly groundless suit.

A person is liable for the tort of interference with prospective business advantage if, without privilege to do so, he induces a third person not to enter into a business relation with another. *Cesnik v. Chrysler Corporation*, 490 F.Supp. 859, 874 (M.D. Tenn.1980). The elements of the tort are: 1) the existence of a business relationship (not necessarily reduced to a contract); 2) that the defendant knew about this relationship; 3) that the defendant intended to interfere with this relationship or knew with a substantial certainty that his actions would interfere; 4) that this intended interference was improper

or unprivileged; 5) the interference must be malicious; 6) the interference must induce or otherwise cause the damage; and 7) damage must result.

*See,* Restatement (2d) of Torts §§ 766, 766(b) and 767 and Comments thereto (1977). Justification or privilege is a defense to the tort.

It is unclear whether Tennessee courts recognize the tort of interference with prospective business advantage. Plaintiffs cite *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476, 485 (Tenn.App. 1978) for the proposition that the tort may not exist in Tennessee. In *Taylor*, the Tennessee Court of Appeals, Middle Section, held:

> ... we note our agreement with the trial court's grant of summary judgment in defendant's favor on the cause of action for intentional interference with prospective advantage. Plaintiff has presented no evidence to raise an issue of material fact on any of the elements of that tort in the instant case. *See Prosser, supra,* § 130. He has cited no authority in support of this cause of action, nor even any to show that such a tort exists in Tennessee.

*Id.,* at 485. The Tennessee Court of Appeals thus left the question largely open. On the one hand, the Court analyzed the claim, thus indicating that the tort was not wholly obscure. On the other hand, the Court noted that it was unaware of any cases recognizing the tort in Tennessee.

Since *Taylor*, this Court has had occasion to consider the tort of interference with prospective business relations. In *Cesnik*, Chief Judge Wiseman held that the tort was indeed a part of Tennessee's substantive law. *Cesnik*, 490 F.Supp. 874. The Court noted that Tennessee has not developed any substantial body of law regarding the tort, yet recognized that substantial case law had developed with respect to the tort of interference with existing contractual relations. Implicitly likening the one tort to the other, and borrowing the elements of the tort from the Second Restatement of Torts, the Court clearly held that the tort was recognized in Tennessee.

More recently, however, the Tennessee Court of Appeals again has expressed its doubts as to whether the tort exists in Tennessee. In *Hicks v. Metropolitan Government of Nashville and Davidson County*, No. 86–49–II (Tenn.Ct.App. Oct. 3, 1986) [1986 WL 10885], Judge Ben Cantrell analyzed a claim based on the tort "assuming this tort is recognized in Tennessee." Slip Op. at 6. Whether the tort of interference with respect to business advantage is recognized by the courts of Tennessee is therefore unclear.

Assuming *arguendo* that the tort exists in Tennessee, *no* Tennessee court has come even close to applying it to groundless civil lawsuits. Indeed, the most apposite Tennessee case would seem to go the other way. *See Lann v. Third National Bank*, 198 Tenn. 70, 277 S.W.2d 439 (1955). Defendants have called the Court's attention to the comments of the Restatement. These comments do indeed note that one of the early bases of the tort was the filing of improper lawsuits. The authority to support such a theory is, however, scant, and to say the least, very old.

The Tennessee courts have recognized only two tort actions that may be brought to obtain redress for the alleged misuse of legal process by another: abuse of process and malicious prosecution. *Donaldson v. Donaldson*, 557 S.W.2d 60, 62 (Tenn.1977). To hold that the tort of interference with prospective business advantage also applies, would certainly be a radical extension of the now existing law in Tennessee.

Assuming *arguendo* that the tort does apply in Tennessee to groundless civil lawsuits, however, it simply cannot form the basis of a counterclaim in the allegedly groundless action. My own research has revealed two cases which make this point clear: *Griffin v. Rowden*, 702 S.W.2d 692 (Tex.App. 5 Dist.1985); and *Woodcourt II, Ltd. v. McDonald Co.*, 119 Cal.App.3d 245, 173 Cal.Rptr. 836 (1981).

In *Griffin*, a contractor sued some oil and gas lessees for breach of an oil and gas farm-out contract, and the leasees counterclaimed, *inter alia*, for tortious interference with advantageous business relationships. The first act claimed to constitute the tort was the filing of the allegedly frivolous lawsuit and notice of *lis pendens* against the mineral leases held by the defendants. The Court squarely held that *lis pendens* is absolutely privileged in an action for tortious interference with contract. To support this holding, the Court quoted from a Texas Supreme Court decision which held that "good faith litigants should be assured access to the judicial system." 702 S.W.2d 695 (citing *Sakowitz, Inc. v. Steck*, 669 S.W.2d 105, 107 (Tex.1984)).

In *Woodcourt II*, it was alleged that the recording and maintenance of *lis pendens* constituted intentional interference with prospective economic and business advantage. The Court held:

Our courts have concluded that ... the public policy of affording litigants the utmost freedom of access to the courts to secure their rights and defend without fear of being harassed by defamation actions underlying recognition of this privilege outweighs any public policy which might support appellant's position.

*Woodcourt II*, 119 Cal.App.3d at 249, 173 Cal.Rptr. at 838. The Court in *Woodcourt II* thus "recognized that access to courts without fear of defamation actions outweighs the danger of interference in the affairs of others." 702 S.W.2d at 695.

The undersigned construes these cases to mean that a pending lawsuit is absolutely privileged, and cannot constitute interference with prospective business relations as a matter of law. To hold otherwise would be tantamount to opening the floodgates to a whole barrage of premature claims filed by dissatisfied defendants. Such an *in terrorem* effect directly conflicts with the public policy of assuring good-faith litigants access to the courts.

I therefore conclude that the counterclaim in this action should be dismissed. It is unclear whether the tort of interference with prospective business advantage exists in Tennessee. Assuming *arguendo* that the tort exists, it is doubtful whether Tennessee courts would apply the tort to groundless civil lawsuits. However, even assuming that the tort would be recognized

as applying to groundless civil lawsuits, I am convinced that the tort could not be raised as a counterclaim in the alleged groundless lawsuit.

## RECOMMENDATION

Based on the foregoing analysis, I respectfully recommend that plaintiffs' motion to dismiss the defendants' counterclaim be granted.

## RECOMMENDATION

Based on the foregoing analysis, the undersigned respectfully recommends that the motion of defendant Merrill Lynch be granted in part, and that the following claims be dismissed from this lawsuit pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure:

1) plaintiffs' claims under Section 17(a) of the Securities Act of 1933;

2) plaintiffs' claims under the Tennessee Consumer Protection Act;

3) plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act; and

4) plaintiffs' claims of *respondeat superior* liability based on the conduct of Michael Williams.

The undersigned respectfully recommends that, with respect to the motion of defendant Morton Olshan to dismiss, the following claims be dismissed:

1) plaintiffs' claims under Section 17(a) of the Securities Act of 1933;

2) plaintiffs' claims under the Tennessee Consumer Protection Act;

3) plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act; and

4) plaintiffs' claims for breach of contract and breach of warranty found in Count V of the Comprehensive Amended Complaint.

The undersigned respectfully recommends that the motion of defendant Laventhol & Horwath be granted as it pertains to plaintiffs' claims under Section 17(a) of the Securities Act of 1933, the Tennessee Consumer Protection Act, and the Racketeer Influenced and Corrupt Organizations Act.

I further recommend that a ruling on defendant's motion to dismiss be in all other respects reserved, pending 90 days of discovery and the filing of an amended complaint.

The undersigned respectfully recommends that the motion of defendant Dominion Federal Savings & Loan Association to dismiss be granted as it pertains to plaintiffs' claims under Section 17(a) of the Securities Act of 1933, the Tennessee Consumer Protection Act, and the Racketeer Influenced and Corrupt Organizations Act. I further recommend that a ruling on defendant's motion to dismiss be in all other respects reserved, pending 90 days of discovery and the filing of an amended complaint.

It is respectfully recommended that plaintiffs' motion to dismiss the defendants' counterclaim be granted, and that the counterclaim be dismissed.

## OBJECTIONS

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of receipt of this notice, and must state with particularity the specific portions of this report, or the proposed findings or recommendation to which objection is made. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).